## SUPREME COURT.

THE PEOPLE OF THE STATE OF NEW YORK, and JAMES B. TAYLOR, and OWEN W. BRENNAN agt. THE MAYOR, &C., OF NEW YORK, and others.

*Held*, in this case, 1st. That the *lease* granted by the commissioners of the land office in the name of the people of the state, at a rent of less than one-tenth the value of the term, taking of indemnity against costs, and giving an inconsistent covenant for quiet enjoyment, was confessedly, on its face, the lease of a law suit, in violation of the spirit, if not the letter of the statute of champerty, and therefore *void*.

2d. That although the people, through their representatives in the *legislature*, can make that legal, which, by the general law is illegal, their executive functionaries intrusted with special limited duties have no such dispensing power. The unauthorized use of the name of the people does not make the deed the act of the people.

3d. The *lease*, had there been no adverse possession, was equally void as " a grant of land under water," made not for " the promotion of commerce," but for the *mere emolument of private individuals*.

4th. That it was *void* also as a grant of land under water to persons other than the proprietors of the *adjacent lands*.

5th. That the *lease being void*, the lessees had no standing in court to call in question the title of the city, or its mode of management.

6th. The alleged conversations of individual members of the city government, (even if not denied, as they substantially were,) are no evidence in law to determine or to divest the city's title to its real estate of which it is confessedly in possession, which was in effect created by the city, and of which the city *claims to be the owner in fee.*

7th. That the *judgment by default, and the proceedings upon it*, were in the nature of a *collusive attornment*, made by tenants to the prejudice and without the consent of their landlord, and therefore *void.*

8th. That the defendants having made a clear case of *merits* on their part, as well as of demerits on the part of their adversaries, are entitled on that ground to have the *default opened*, and to be *allowed to defend.*

9th. That the *judgment* entered against all the respective occupants *in solido*, for the aggregate rental of the whole premises, notwithstanding the implied admissions in the complaint, instead of a judgment for costs in favor of all the defendants but one against the plaintiffs, was *contrary to law.*

10th. That the *default allowed by one of the defendants* while holding a substitution in his hands, *in collusion with the plaintiffs*, was a *fraud upon the other defendants*, and should for that reason, were there no other, be *opened*, and all the proceedings founded on it *set aside*. (*It will be seen that this opinion takes a different view of some of the questions involved from that reported in s. c* 17 *How. Pr. R.*, 56.)

*New York Special Term, July*, 1859.

THIS was a hearing on an order made on the 6th June, 1859, that the plaintiffs show cause why the trial and judgment in this action should not be set aside, why the receiver therein should not be discharged, and the possession of the property in question restored to the defendants, the mayor, aldermen and commonalty of the city of New York; and that on passing his account, the balance in the hands of said receiver of the rents of the said property be passed over to the said city, and why the default therein as to the defendants other than the said city should not be set aside, and why the said city should not be authorized to defend said action for said other defendants, if necessary, &c.

RICHARD BUSTEED, *corporation counsel.*

WM. CURTIS NOYES *and* JOHN MCKEON, *for the motion.*

WALDO HUTCHINS, E. W. STOUGHTON *and* JOHN VAN BUREN, *for the plaintiffs, opposed.*

ROOSEVELT, Justice. The corporation of the city, it appears, having filled in the plot of about four hundred and sixty feet square, constituting. the water front of the old Washington market, and constructed a bulkhead and piers in connection with it, gave permits from time to time to various persons, more than one hundred and eighty in number, to erect upon it temporary sheds for the sale of meats and vegetables; the respective occupants paying, as the complaint avers, a "weekly sum for rent" or the use thereof.

On the 24th day of April, 1858, while the city was thus in possession of the premises, claiming the ownership and receiving from them a revenue in the aggregate $50,000 per annum, the commissioners of the land office, in the name of the people of the state, for reasons not very satisfactorily explained in the papers before the court, and

seemingly without notice to the city authorities, executed to James B. Taylor and Owen W. Brennan, two of the plaintiffs, a lease of the whole plot at a rent, for one year, of $5,000, and with a covenant, if valid, binding the state to maintain them, the two lessees, in peaceable and quiet possession.

Immediately upon the execution of this lease, Taylor and Brennan, in their own names alone, instituted an eject-ment or quasi ejectment against the city, and its one hun-dred and eighty tenants, to indemnify themselves for the $5,000 payable by them into the state treasury, by with-drawing ten times that amount, and more, from the trea-sury of the city—a not unimportant portion of the state.

The complaint in its original shape, being soon found to be defective, an amended one was filed, making the people of the state co-plaintiffs, and praying, among other things, in addition to " the rendering of *possession* to the plain-tiffs (that is, the people and Taylor and Brennan) or to such of them as shall be declared entitled thereto," that the defendants may be adjudged " to pay to them jointly or severally the sum of *one hundred thousand dollars* dam-ages for the rents, issues and profits, whilst the same have been unlawfully withheld from the plaintiffs."

This complaint is verified by James B. Taylor; but instead of being subscribed as usual by one name or firm as " attorneys for the plaintiffs," it purports to be signed by the attorney general for the people, and by other attorneys for Taylor and Brennan.

On the 15th of February, about nine months after its commencement, with the consent of the attorney for the city, and on motion of the attorney for Taylor and Bren-nan, nothing being said in the order as to any motion or consent on the part of the people, the other plaintiffs, the suit, as against the city, (" costs having been paid ") was discontinued—so far at least as such an order could have that effect.

Having thus disposed of the city, the only real party to the controversy, and having made some arrangement, as may be inferred, with one or more of the other defendants, the precise nature of which does not appear, the plaintiffs on the 13th of May, 1859, brought the cause on to a nominal trial, their adversaries, as the order expresses it "having, *by failure to appear*, waived a trial by jury," and the judge "*thereupon* found and directed judgment to be entered as follows:" in substance *first*, that one set of plaintiffs, to wit: the people, recover possession of the land; *second*, that the other set, to wit: Taylor and Brennan, having been previously entitled to the possession of the premises for the year just expired, recover possession of the *rents* for that period, adjusted at the sum of sixty-nine thousand one hundred and eight dollars and forty-five cents, to be paid by "the *defendants*," not proportionately and respectively, but *in solido* (that being the legal effect of the terms), "as damages for the withholding of the possession of the premises from the plaintiffs (Taylor and Brennan,) from the 1st of May, 1858, to 24th of April, 1859.

It will thus be seen—without reference to another feature in the transaction which I shall presently advert to, that Taylor and Brennan in one year recover in round numbers $70,000, on an outlay of $5,000, and that the city at the same time is dispossessed of the same amount of revenue, and of the fee of a property, which by the plaintiffs' showing is worth more than a million, without a trial, and after the plaintiffs, or two of them at least, had voluntarily discontinued the suit, as against the city and admitted it to be unfounded, by "paying the costs" of the defence. Nor is this all—the tenants, so called, the mere temporary occupants "respectively" of distinct and separate moveable shanties, are made liable, not each for his own occupancy, but each for the whole plot, to the seemingly enormous ex parte assessment of $70,000, and that

too after they had already, by an interlocutory proceeding, as will presently be shown, been directed to pay their respective rents for the same identical period to a receiver appointed by the order of the court, made at the instance of the plaintiffs themselves.

The statute too provides (2 *R. S.*, § 307,) that when an action is against several defendants, if it appear on the trial (as it must necessarily have done in this case), that any of them occupy distinct parcels in severalty or jointly, and that other defendants possess other parcels in severalty or jointly (that is singly or in groups), the plaintiffs shall elect, at the trial, against which he will proceed; which election shall be made before the testimony in the cause shall be deemed closed; and a verdict shall thereupon (as a sort of penalty) be rendered *for the defendants not so proceeded against.*" In other words, if a plaintiff, as in this instance, shall bring an ejectment against a multitude of persons not holding in common, but in distinct and separate parcels, he shall, instead of recovering against all, pay the costs of all except one.

The well known existence at the time of such a provision of law, together with other circumstances already in part alluded to, demonstrates that the judgment complained of must have been the result of collusion, accident, mistake, or fraud. A tenant, whether by his own direct act or by a collusive judgment, has no right or power to surrender the possession of his landlord to a stranger against his landlord's consent. (1 *R. S.*, 744.) A fraudulent attornment is none the less fraudulent and none the less void by being invested with the habiliments of a sham judgment, which itself in such case is one of the strongest indicia of collusion.

It is to be observed that this judgment was obtained notwithstanding that the defendants only a few days before had able and faithful counsel; and was obtained by default, and in its present extraordinary and illegal form,

notwithstanding that those counsel, as the plaintiffs them-
selves show, were paid *nine hundred dollars* to watch over
the interests of their clients.   And it is further to be
observed that, notwithstanding the seemingly onerous and
certainly most irregular form of the judgment, one of the
very defendants, against whom it stands on the record, is
found making an affidavit to resist the motion, to vacate
the entry, and to let the parties in to defend their rights.

But the case does not stop here.   On the very day of
filing the first complaint, and before the name of the people
was inserted in the proceedings, the plaintiffs obtained
from one of the judges an order, usually very much a
matter of course, requiring the defendants to show cause,
not before him or before any one of the judges who might
be present at chambers, but before another and a particu-
lar judge by name, why an injunction should not be issued
and a receiver appointed to take charge of the premises
and collect the rents.   Although this notice of motion (an
order to show cause is in substance nothing more) was
returnable on the 17th day of May, 1858, three days after
its date, yet, for some reason unexplained, no hearing upon
it was had till the 29th of June, and no decision till the
2d of August,—clearly showing that the necessity for a
private receiver as against the ample guaranty of the city
treasury, and that too in an ejectment suit, was not very
pressing even if the right had been undisputed, as it cer-
tainly was not, and as the admissions in the present argu-
ment show it could not be.   A receiver in an ejectment
suit is confessedly, in any case, a novelty—in a case where
there is nothing to be injured and (the city of New York
not being quite yet insolvent) nothing to be lost, it is, I
conceive, without a precedent—for even the one made by
the special term order in the present instance was over-
ruled, as I am informed, at the general term, although the
decision, in consequence, it is said, of the supposed discon-
tinuance above referred to, was never formally pronounced.

On the 2d of August nevertheless—erroneously as the written opinions of the general term subsequently showed— a receiver (Mr. Cyrus Curtiss) was appointed, during the pendency of the action, and until the further order of the court ; first giving security in the sum of $20,000, and with directions to pay all moneys into the United States Trust Company, to be drawn out only on a judge's fiat, as the court should from time to time direct.

Before, however, any action was had on this appointment, the city authorities conceiving the order to be erroneous, appealed from it to the general term, and on the 4th of August, pending the appeal, applied to another judge, as the practice permits, and obtained a stay of proceedings, without security, till a decision on the appeal could be had.   On the 13th of the same month another order modifying the previous one was obtained, allowing the receiver " to collect the rents," but without prejudice to any motion to be afterward made, &c.   Mr. Curtiss, accordingly, with limited powers, entered partially upon the duties of the office of receiver.   He was "at liberty (as the order declared) to collect the rents," until the decision of the general term, unless even this " allowance " should previously to the hearing be " vacated " by " any of the justices of this court."

Judge CLERKE, it is obvious, had great hesitation in modifying his absolute stay of proceedings, even to the above extent, and he finally concurred in reversing the order of the 2d of August for an injunction and receiver, altogether.

Much of the present difficulty would have been obviated had that reversal, like others at the same term, been duly announced and entered of record before the discontinuance of the 15th of February.   I see no reason, however—none that is insuperable—why the reversal actually agreed on by the court may not now be entered, *nunc pro tunc*, according to the facts, as of November, 1858.

Should, however, the order appealed from not be vacated in the manner indicated, the question will present itself, and it must prospectively be considered, what was the effect upon it of the partial discontinuance of the suit itself, after the order appointing a receiver in the suit and the actual appointment under it were made.

It is quite obvious, as it seems to me, that the intention of the corporation counsel, in consenting to a discontinuance, exacting costs as a condition precedent, and of the counsel of the plaintiffs, *in paying the costs*, was, that so far as the city was concerned, matters should be restored to their *statu quo*, and stand thereafter precisely as they stood before the commencement of the suit. Without a suit against the city no receiver against the city could have been appointed. The order would not have been merely erroneous but void. Striking out the city therefore was striking out the order—and a judicial declaration therefor, for the guidance of the receiver as an officer of the court, may properly be made to that effect. Such a declaration would not be a reversal by one judge of the order of another judge. It would be simply an adjudication that the parties, by their own subsequent acts, had taken from under the order, the basis on which it rested, and as a consequence that the order fell. In such a proceeding there is no unfitness or interference.

The order of the 2d of August had moreover been temporarily modified or suspended by Judge CLERKE. This he was authorized to do, pending an appeal, by express statute. Mr. Curtiss never was, therefore, put in *possession of the premises*, or authorized " to take charge of, or to let the same." All proceedings in that direction were " stayed." He was " at liberty to collect the rents," meaning of course the rents on antecedent lettings by the city, and not to make new leases himself. He occupies consequently the position of a sheriff, who has received moneys under an attachment, in a suit subsequently discontinued

before judgment, and who of course must refund them to the defendant to whom they originally belonged. For greater caution, perhaps, like the sheriff, he would require, and would be justified in requiring, an order to that effect. But such an order would only declare, not give, rights. As to the *land* itself, the receiver having no possession himself, could give no possession to others; and the tenants owing a duty to their landlord, the city, and having received possession from the city, could only attorn to a stranger by first obtaining the city's consent. An attornment of their own will, without such consent, is regarded in law as an act of quasi treason, and therefore void.

The receiver consequently obtained no possession of the land, by the order of the court or by the act of the tenants. The one was suspended and is so still; the other had no legal existence from the beginning.

As to the judgment which was allowed to be entered by default, I have shown I think already, that it contains on its face the most unequivocal intrinsic evidence of collusion between some of the plaintiffs, and some, perhaps only one, of the defendants, abundantly sufficient to set it aside as against the city, and all the defendants not implicated in the arrangement. There is, however, an additional circumstance no yet adverted to, which naturally strengthens this conclusion.

The same one of the defendants who, and who alone, in June, 1858, verified under oath an answer in opposition to the plaintiff's claims; and who, in June, 1859, presented an affidavit, similarly verified by himself, in support of their claims, was furnished, *two days before* the so called trial of the cause, with a written substitution in blank, to be filled up at his discretion, signed by the then attorneys of all the defendants except the city, they receiving from him at the time (contributed by whom it is not stated by him) the liberal compensation as already shown of $900 for their past services. This substitution in blank, (I

quote his own affidavit) he kept and still keeps unacted on in his pocket—showing conclusively that its sole object, as understood at least by himself, was to discharge one attorney and not to provide for another—in other words, to let his apparent adversaries quietly take by default any judgment in any form they might see fit, not only against himself but also against all his confiding associates, and against the city too, if its effect be such as is now contended for by plaintiff's counsel.

It is urged as a reason among others why the court notwithstanding should not interfere with the plaintiff's proceedings, that the affidavits and papers " clearly show that the city has no title to the premises." If that be so, it must be quite as clear that the execution of a lease by the state officers to two private individuals, for those same premises, yielding a rent of $70,000 and upwards, for $5,000, to the prejudice of a city constituting an interest of more than one-fourth of the state, and that too, as far as appears, without any public notice, was a very extraordinary measure. But the state officers, it appears, if we may rely on their report to the senate, were not quite so clear as the counsel. They exacted, they say, from Taylor and Brennan, by authority of what law is not stated, before giving the lease, a bond to indemnify the state against all costs and expenses incurred in any and all actions that should be brought to test the title to the demised premises—thus in effect admitting that there was an adverse possession at the time, and that the city if sued might establish its title.

They add also, to show their knowledge of the subject, "It is *understood* by the commissioners, that the title of the state to the land rests upon the ground that said lands have been made filling in the Hudson River, *without cost to the state below high water mark*, and beyond the boundaries of any lands that had been previously granted either by the ancient charter of New York, or by any subsequent

grant; that said lands having been formed by additions made to the bed of a public navigable river, the title thereto is vested in the people of this state. This title, however, is disputed by the persons claiming in hostility to the state, but upon what grounds these claims are based the commissioners are not fully informed." Had they extended their researches the commissioners would probably have ascertained that the city indubitably owned the land at least to (and 400 feet beyond) *low* water mark, and of course several feet beyond the " high water " line. (See the charter.)

They might also have ascertained or at least have discovered some probable ground for supposing that the city not only owned to that extent the land under water with the right of building on it, but with " all and singular the benefits, easements, advantages, &c., thereto belonging or appertaining," including not improbably the right of wharfage and navigation and other uses of the water in front, to the exclusion of course of any right in the state, without just compensation, to deprive the city of these appurtenances and lease them to another, especially if such lease were not for " public use," but mere private emolument. It may be that the filling in, if any, beyond the outer line fixed by law, wherever that line may be, was an injury to navigation, and as such a purpresture and public nuisance, for which the city, if it occasioned any serious injury to the general public, might have been indicted by the state, and which, if practicable, the city may perhaps have been compelled, not by the fiat of the land office but by the will of the legislature, to remove—for that or for any other reason, (*Lansing* agt. *Smith*, 4 *Wend.*, 9.) But did the ground formed by the encroachment constitute state *land*— improved state land "—which the state officers could *lease* to private individuals, and not for the removal of the nuisance if it was one, but for the continuance of it, to be

built upon and occupied to their profit and to the preju-
dice of the city ?

The right of the state to the substratum of a navigable
river below low water mark, and four hundred feet beyond,
does not, as it seems to me, come within the words "lands
belonging to the state," (1 *R. S.*, 198,) which the commis-
sioners of the land office are authorized "to lease for
terms not exceeding one year." To warrant such leasing
the law not only requires that the subject of the lease
should, in the ordinary sense of the expression, be " *lands*
belonging to the state," but " *such lands*, belonging to the
state, as have *improvements* on them," and those improve-
ments too, justly and equitably *the property of the state*, as
well as the land on which they were made. What color
of authority then was there for the lease on which this
action is founded ? As it appears to me, none. Even the
counsel who framed the amendments to the plaintiff's com-
plaint, has impliedly signified an opinion to that effect. In
the first clause, as amended, he avers the right of the state
to the possession of the premises, " *unless* a certain lease
thereof to James B. Taylor and Owen W. Brennan, here-
inafter more particularly referred to, *be valid.*" In the
same clause he alleges that the corporation of the city
have taken possession thereof, " and, *unless* said lease *be
held valid*, withhold from the *people* the possession to *their*
great damage."

In the third clause he avers that " under said lease, *if
the same be held valid*, the plaintiffs, Taylor and Brennan,
became lawfully possessed of the premises." Such lan-
guage and such frequent repetition of it, are not usually
characteristic of counsel entertaining a clear conviction of
the solidity of their clients' pretensions.

To make the argument still stronger, however, there is
an express statute specially on the subject " of grants of
land under water," (1 *R. S.*, 208,) applying equally to
leases for one or more years, as to conveyances in fee.

" The commissioners of the land office (says that statute) shall have power to grant in perpetuity, *or otherwise*, so much of the lands under the waters of navigable rivers or lakes, as they shall deem necessary *to promote the commerce* of this state, or proper for the purposes of *beneficial enjoyment* of the same *by the adjacent owners;* but no such grant shall be made to any person other than the proprietors of the adjacent lands; *and any such grant that shall be made to any other person shall be void."*

The grant therefore to Taylor and Brennan, out of which this litigation has sprung, and on which the injunction and receivership, and final judgment rest, is a direct violation of law, and not only of dubious validity, but absolutely void. Whatever, consequently may be the title of the city—and it certainly is not to be determined, as in this case has been attempted, by the loose conversations, inaccurately reported, of corporate officials—whatever, I say, may be the city's title, Taylor and Brennan it is clear are not authorized to call it in question. *They* have no standing in court.

So much for the state's grantees. As to the grantors or rather the assumed agents of the grantors, their opinion on the subject, as already observed, may be measured by comparing the $5,000, for which they sold the right for one year, with the $70,000 which they say they " proved " the rents for one year (on the trial) to be worth.

There is still another objection to be considered. This suit, it is apparent, although the name of the people has been made use of, was commenced for the benefit of individuals. Now the statute on the subject of " actions of ejectment in the name of the people " expressly declares (1 *R. S.*, 180) that no such suit shall be commenced for the benefit of an individual without the consent of the attorney general, and no such consent shall be given by the attorney general, unless the individual desirous to prosecute the suit, shall give security (not to the people,

but to the defendant) for the payment of the taxable costs, in case the suit shall be determined in favor of the defendant." It is made "the duty" also of the attorney-general (§ 1) "to prosecute and defend all actions in the event of which the people of this state shall be interested." Here, no such consent was given or applied for, and of course no such duty performed till long after "the name of the people" had been inserted in the complaint, and after the complaint had been matured into a judgment. And I do not admit that in the case of a public officer with powers strictly defined by law, an *ex post facto* consent, given not by the principal, but by the agent, can make that valid which before was void. Nor do I see how the attorney general was to discharge "the duty" of "prosecuting," while he has no knowledge of the pendency of the prosecution. The name of the people, it appears, and of the attorney general, was first used in obtaining the injunction of the 26th of May, 1858. A year or thereabouts, after that date in answer to "a resolution of the senate," he reported that no such action had been commenced by him, or by his authority, nor had he charge of any such action. He adds, however, that "*on examination* of the proceedings of the commissioners of the land office"—showing that he had no knowledge of the matter before—"he *finds* a resolution entered in the minutes, authorizing a distinguished member of the bar by name, to take charge of the interests of the state in the action brought to recover the possession of lands known as West Washington Market, at the expense of the lessees."

Under what law such a resolution was passed I am unable to discover. The attorney general himself, in case of necessity, is undoubtedly "authorized to employ additional counsel" (1 *R. S.*, 181, § 17), but a resolution of the land commissioners, although he be one of the members of the board, especially if he was not present (and the law, as it does, gives all the powers to the majority),

is clearly not "an employment *by the attorney general.*" It is an employment, if at all, by the board, as a board, and not by either of its ex-officio members in their distinct and separate capacities. And how could private counsel, thus employed without the knowledge of the attorney general, and without informing him of the existence of the suit, be said to be "counsel additional to him"? The resolution referred to was therefore a nullity, notwithstanding the action of the attorney general on the 8th of June last. His *post mortem* letter of that date, "consenting that the action be continued in the name of the people," cannot resuscitate a dead proceeding, and one which never had any vitality. All the important steps in the suit—the complaint, the injunction, the receiver, the *ex parte* trial, the judgment, the execution, the dispossession—all were prior to the date of that consent, and were therefore all illegal and void as against both the city and the state, and it was not competent to the attorney general, by any *ex post facto* volition on his part to prevent their being so declared, or to deprive the city of its rights resulting from their invalidity. They were void—not voidable. There was no power in the *land board* prospectively to dispense with *the attorney general,* and no power in *the attorney general,* retrospectively, to dispense with *himself.* The consent of the attorney general on the 8th of June, that the action— meaning of course so far as anything after that date was to be done—should be *continued* in the name of the people, was no doubt sufficient to warrant any *subsequent proceedings.* But his "desire" accompanying it, "that no objection based upon the allegation of any want of authority to prosecute said action in the name of the people as plaintiffs should prevail," although entitled to the most respectful consideration, as a matter of courtesy, can have no retroactive effect, as a matter of law. The law of the land and the rights of parties are superior alike to the "desires" and "consents" of public officers, however exalted. They

can neither dispense with the one, nor divest or interfere with the other.

Counsel have cited a section of the act in relation to the office of attorney general (1 *R. S.*, 181), in which an incidental allusion occurs to actions of ejectment "brought by the attorney general, *or by the sanction of the commissioners of the land office.*" I see no incongruity, however, in allowing the commissioners, in certain cases, to *direct* suits, and at the same time by another section providing that *such suits* when so directed by the commissioners, shall be "prosecuted" by the attorney general, and by him alone; unless *he*, and not the commissioners, shall see *fit*, by reason of the press of other official duties, to employ "additional counsel." If this view of the law be correct —and I see no reason to doubt it—the appointment by the commissioners of private counsel "to take charge of the interests of the state" in this action, was an oversight, and gave no authority to the distinguished appointee, beyond what he derived from his individual clients. The people, consequently, as a matter of law, were not represented in the suit, and incurred no obligations, and acquired no rights, either from the order in question, or from the undefended judgment that followed upon it.

But the commissioners had no authority to "direct" an action in the present case, no matter by whom conducted. "The general care and superintendence of all *lands* belonging to the state" (1 *R. S.*, 198), interpreted by the whole scope of the statute, is a power clearly having no application to the bed *of the Hudson River*.

It means lands in the common acceptation of that term —lands wild or improved, of which the state was the original owner, or to which it has become entitled by foreclosure, or purchase, or contract, or gift. It surely could never have been contemplated that by the use and by the mere force of these general expressions, the commissioners of the land office were to "survey" or "sell" or "grant"

or "lease" *the bed of the Hudson River*, "for the promotion of the settlement thereof," taking care to observe the injunction "not to sell more than twenty thousand acres at any one auction, and to expose to sale each lot separately" (1 *R. S.*, 201), or that they were to direct ejectment suits to preserve the bed of the Hudson from obstruction any more than that they were to preserve it from obstruction by granting leases to private individuals, with liberty, by implication, to fill it up and build on it themselves, or to build on the filling already done at the expense of the city.

"Actions of ejectment brought by the direction of the commissioners of the land office," means, necessarily, actions which the commissioners were authorized *by law* to direct the attorney general to commence and prosecute. This was not such an action. It was not an incident to the power of taking "care of the lands of the state." Lands under water were not the lands intended by general provisions. They were provided for, as we have seen specially in a distinct article, containing no authority, express or implied, to direct an ejectment for what the law denominates a nuisance or purpresture—a wrong if seriously prejudicial to be redressed by the legislature, or perhaps by the grand jury; certainly not by the land office.

The direction, moreover, if given, was a direct violation of the spirit of the statute of champerty and maintenance. Its object and intent was to give effect to the lease. That lease to the extent of the term embraced in it, was the sale, not by the people or its legislative representatives, but by executive officers with defined and limited powers, of "a pretended right or title," to lands of which the grantor was not "in possession," and we can hardly presume that the legislature, without express language to that effect, intended to authorize public officers to do an act, essentially wrong in itself, and as to which, by a general law, they have declared that "no person" should do it,

and that every person "violating the commandment should be deemed guilty of a misdemeanor." (2 *R. S.*, 691.)

From what has been said, and from other arguments which will readily suggest themselves, the following propositions may be deduced:

1. That the lease granted by the commissioners of the land office in the name of the people of the state at a rent of less than one tenth the value of the term, taking a bond of indemnity against costs and giving an inconsistent covenant for quiet enjoyment, was confessedly, on its face, the lease of a lawsuit, in violation of the spirit if not of the letter of the statute of champerty, and therefore void.

2. That although the people, through their representatives in the *legislature*, can make that legal which, by the general law is illegal, their executive functionaries intrusted with special limited duties have no such dispensing power.

The unauthorized use of the name of the people does not make the deed the act of the people.

3. The lease, had there been no adverse possession, was equally void as " a grant of land under water," made not for "the promotion of commerce," but for the mere emolument of private individuals.

4. That it was void also as a grant of land under water to persons other than the proprietors of the adjacent lands.

5. That the lease being void, the lessees had no standing in court to call in question the title of the city, or its mode of management.

To warrant the appointment of a receiver before judgment, the code requires (§ 244) that the party shall "establish an apparent (that is, a *prima facie*) right to the property which is the subject of the action, and which is in the possession of the adverse party;" "*and*," also, that he shall establish, as matter of fact, that "the property, or its rents and profits, are in danger of being lost or materially injured or impaired."

Taylor and Brennan did neither.

No injury to the *shanties* was pretended, and if it had been, the injury was no wrong to the plaintiffs. And as to any loss of *rents*, the metropolitan city of the United States being responsible for the *value* of the use, whether more or less than the actual receipts, the security, it may be presumed, was not less ample than the individual bond for $20,000 of a private receiver.

6. The alleged conversations of individual members of the city government (even if not denied as they substantially were) are no evidence in law to determine or to divest the city's title to its real estate of which it is confessedly in possession, which was in effect created by the city, and of which the city claims to be the owner in fee.

7. That the judgment by default, and the proceedings upon it, were in the nature of a collusive attornment made by tenants to the prejudice and without the consent of their landlord, and therefore void.

8. That the defendants having made a clear case of merits on their part, as well as of demerits on the part of their adversaries, are entitled on that ground to have the default opened, and to be allowed to defend.

9. That the judgment entered against all the respective occupants *in solido*, for the aggregate rental of the whole premises, notwithstanding the implied admissions in the complaint, instead of a judgment for costs in favor of all the defendants but one against the plaintiffs, was contrary to law.

Even if the complaint did not admit the separate occupancy in distinct parcels, the affidavits show the fact indisputably, and that it would be established on the trial, should a real trial be had.

10. That the default allowed by one of the defendants while holding a substitution in his hands, in collusion with the plaintiffs, was a fraud upon the other defendants, and should for that reason, were there no other, be opened and all the proceedings founded on it set aside.

An order will accordingly be entered (its form to be first settled by the court) to the following effect:

1. That the order of the 2d of August, granting an injunction and appointing a receiver, be cancelled or vacated, and the rents collected under it, accounted for before a referee, and the balance paid over by the receiver on passing his account to the city, and deposited in the treasury.

2. That the default taken at the circuit in consequence of the failure of the tenants, be opened; the judgment entered thereon vacated, and the execution and all subsequent proceedings, including the attornments, if any, signed by the occupants, be set aside.

3. That the order of discontinuance irregularly entered without the consent of the people, on the supposed consent of all parties and on the implied, conditional and misapprehended or misapplied consent of the corporation counsel, either *be* discharged and the city re-instated as co-defendant in the action, or if not, that the city be allowed as the sole party to defend, in the place of, and without regard to their nominal, and in some respects disloyal tenants, whose "weekly" occupancy as existing at the commencement of the suit has necessarily long since expired.

4. That for greater caution an injunction issue restraining the occupants from paying to the plaintiffs, or the receiver, and the plaintiffs and the receiver from collecting of the occupants, any rents or moneys whatever, for the use or occupancy of the premises in question until the further order of the court.