State, &c. ex rel. JOHN C. SCARBOROUGH v. JAMES L. ROBINSON and JOHN M. MORING.

*Act of Assembly—Signatures of Speakers—Judicial Power.*

1. The signatures of the presiding officers, by article two, section twenty-three of the constitution, must be affixed to an act of legislation during the session of the general assembly, and are necessary to its completeness and efficacy.

2. The judicial power cannot be exercised in aid of an unfinished and inoperative act, so left upon the final adjournment, any more than in obstructing legislative action.

(*Cotten* v. *Ellis*, 7 Jones, 545 ; *Gatlin* v. *Tarboro*, 78 N. C., 119 ; *Brodnax* v. *Groom*, 64 N. C., 244, cited, commented on and approved.)

APPLICATION for *Mandamus* heard at June Special Term, 1879, of WAKE Superior Court, before *Eure, J.*

The service of summons in this case was accepted by the defendants, and the complaint alleges substantially that on

the 27th of February, 1879, a bill to be entitled an act to revise and consolidate the public school law was introduced in the house of representatives of the general assembly of North Carolina then in session, and on that day passed its first reading; and on the 6th of March, 1879, it passed its second reading by a vote taken by yeas and nays as appears from the house journal, and on the next day (7th) it passed its third reading, the vote being by yeas and nays as appears by the journal, and on the same day it was ordered to be engrossed and sent to the senate for concurrence. It was accordingly engrossed, transmitted to the senate, and passed its first reading in that body on the 8th of March, 1879; its second reading on the 11th; and its third reading on the 12th, the vote being taken by the yeas and nays as appears from the senate journal. The bill was duly enrolled and so reported by the committee on enrolled bills to each house and was announced before adjournment as having been duly ratified as appears from the journals of the two houses, and on the 15th of March, 1879, was transmitted to the office of the secretary of state, when it was discovered that it had not been signed by the presiding officers, and that the secretary of state for that reason refused to receive and receipt for said bill as an original of one of the laws of the state. That the legislature adjourned on the 14th of March, 1879, and through mistake or inadvertence neither of the presiding officers of said houses signed it as required by law, and have not since signed the same. That defendant, Robinson, was then and is now president of the senate, and defendant, Moring, was then and is now speaker of the house, and the relator, Scarborough, is the superintendent of public instruction, and a tax-payer of the state, interested in the due execution of the laws, especially in those relating to the public schools, and has requested the defendants to sign said bill, which request has been refused. Wherefore the plaintiff demands judgment that a *mandamus* issue to

defendants commanding them to sign the said act to the end that it may be authenticated, and for such other and further relief as the case may require.

The defendants answer and say substantially that they admit the facts set out, as hereinafter qualified and explained, or denied. That it does not appear from the house journal that the bill passed its first reading on the 27th of February, but defendants suppose it did, as it was introduced and placed upon the calendar on that day, and that the facts in reference to its alleged passage are as follows : After its passage through the house and its second reading in the senate, the house on the 12th of March, 1879, sent a message to the senate requesting the return of a bill (nearly identical with the one annexed to the complaint) which was complsed with ; and thereafter on same day the senate received a message from the house transmitting the bill to revise and consolidate the public school law which had been recalled by that body for correction. That the bill thus returned was materially changed and was not the bill which had passed its first and second reading in the senate, the change being as defendants are informed and believe in section 26 line 5 of the engrossed bill, substituting the word "may" for "shall," which amendment was made after the passage of the bill upon its second reading in the senate, without a vote of either house ; and after such alteration the bill was not returned to the house for concurrence but put upon its third reading as returned from the house. That it does not appear by the house journal that the bill was announced as duly ratified, and that it is true they have not signed it, and the failure to do so was not from design, but defendants say that at the time of adjournment they had no knowledge or information of the facts set out above. And for a further defence they say that the bill did not pass its three several readings in the senate as required by law and the usage of legislative bodies, and that the legislature

adjourned on the 14th of March, 1879, and they are advised and believe they are not by law required and ought not to sign said bill, and ask to be discharged with their reasonable costs.

By agreement of the parties the court found the facts from the evidence adduced (the journals and clerks of the general assembly) and they are in brief as follows: The bill was regularly introduced and passed its several readings on three several days, on second and third readings by yeas and nays in the house. It was engrossed and sent to the senate and passed its first and second readings, the yeas and nays being recorded on the second reading. It was recalled by the house for correction and then returned to the senate where the returned bill passed its third reading by yeas and nays. It does not appear that any correction was made. That it was duly enrolled, delivered to the committee on enrolled bills, who endorsed that it was properly enrolled, and it was then carried to the speakers and laid before them with other bills for their signatures, and then to the senate and house on the morning of adjournment with a number of other bills, and announced in both houses as enrolled and ratified. After adjournment it was taken by the enrolling clerk to the secretary of state and left with him. On the following day it was discovered that neither of the speakers had signed it, and the secretary of state refused to receive and receipt for it as a law. Thereupon the court held that a writ of *mandamus* issue as prayed for, and the defendants appealed.

There was also a similar proceeding asking that the secretary of state be required to receive the bill as one of the laws of the state, which the court refused, but the facts therein are substantially the same as the above, and the two cases were argued together, and the decision of this court covers the question raised.

*Messrs. Lewis & Strong, W. Clark* and *W. H. Pace* for plaintiff:

The signatures are a mere certificate or authentication of what the legislature has done, not a part of legislation. If assent of speakers, their *discretionary* signatures, is necessary to make a law valid, it gives them a veto power, which the constitution denies even to the governor. There is no authority for interpolating the words, "and shall be signed by the presiding officers" in the first sentence ahead of the semicolon. Const., Art. II, §23. This would change the meaning and make the constitution require the signatures as a pre-requisite; they sign laws already passed by the houses, and the facts found show that the bill was regularly passed. Their duty being ministerial, we contend that the bill is a law without the signatures, and the plaintiff is entitled to a *mandamus* to compel them to certify the act and complete the statute-roll. The counsel then cited and discussed *Cotten* v. *Ellis*, 7 Jones, 545; *Bailey* v. *Caldwell*, 68 N. C., 472; *State* v. *Chase*, 5 Ohio St. Rep.; 12 Peters, 524; 25 Md., 173; 39 Cal., 210. No law in this state requiring them to sign in presence of their respective houses or before adjournment. Where the journals and the act are both certified by the speakers, the certificates are of equal validity. *State* v. *Swift*, 10 Nev., 176; *Legg* v. *Annapolis*, 42 Md., 203. In our case there being no certificate to the act, the plaintiff is seeking to obtain it by using the equally valid certificate made to the journals by the speakers, who are *still* the presiding officers. In *People* v. *Bowen*, 21 N. Y., 517, it was held that the governor could approve a bill after adjournment. See also *Leavenworth* v. *Higginbotham*, 17 Kan., 62. Signatures do not constitute any portion of the law, but furnish evidence of its due passage, and are only portions of the many evidences of its validity, the enrolled bills and the journals being the principal evidence thereof and cannot be contradicted. When it appears from the journals that bill

passed by requisite majority, failure to sign will not invalidate act. *State* v. *Cottrell,* Neb. Rep.

*Messrs. John Manning, Reade, Busbee & Busbee* and *Gilliam & Gatling,* for defendants:

Signatures a legislative act, and *mandamus* cannot issue to order its performance; such writ will never issue as a mere matter of convenience. High on Ex. Leg. Rem., § 15, and authorities cited in note. There is no precedent for this particular action, but the reports abound with cases where the existence and validity of statutes bearing all the marks of genuineness have been assailed. Journals cannot be introduced to attack existence of statute regularly filed among records of state, *a fortiori,* they cannot be, to call into life one which does not appear in such records. The journals were improperly introduced. Counsel then commented on *Brodnax* v. *Groom,* 64 N. C., 244; *Trustees* v. *McIver,* 72 N. C., 77. See especially *People* v. *Devlin,* 33 N. Y., 269; *Sherman* v. *Story,* 30 Cal.; *Pacific R. R. Co.* v. *Governor,* 23 Mo., 352; *Evans* v. *Brown,* 30 Ind., 514, overruling former cases. So the tendency is to return to the English rule as laid down in Hobart 10; 12 Coke, 58. See also *Pangborn* v. *Young,* 32 N. J., 29; 20 Conn., 8; High on Ex. Rem., § 135, *et esg.;* *State* v. *Swift,* 10 Nev., 176; 48 Ala., 115; 32 Miss., 650. Even if journals were admissible, is parol evidence admissible to add to or vary the journals? See cases above cited. *Gatlin* v. *Tarboro,* 78 N. C., 119; Cushing's Law and Pr., § 2395. Signing, which is the authentication, must be during session. 1 Nev., 334; 50 Miss., 802. If court can compel speakers to sign a bill or enjoin them from signing it after adjournment, then it can do the same thing during the session. "To ratify" means to approve, make valid, &c. This is not the office of the speakers. They sign whether they approve or not, and for the body. It is the body that ratifies the bill after it has been enrolled and is perfect. For a

summary of the constitutional requirements of the different states, see 2 Hough's Am. Const., 642.

SMITH, C. J.  The complaint alleges and the facts are so found on the trial in the court below, that a bill relating to public schools and designated as "House Bill No. —" was introduced into the house of representatives at the late session of the general assembly, with amendments, was read three times in that body and in the senate, and was passed and declared ratified in each house as directed by the constitution. From some cause, however, it failed to receive the attesting signatures of the presiding officers of the two houses, which was not discovered until after the final adjournment. The proof of these facts is furnished by the journals, except the ratification by the house which rests upon the memory and oral testimony of the reading clerk.

The object of the action is to obtain the exercise of the coercive powers of the court in compelling those officers to affix their respective official signatures to the bill, and thus to remove all doubt as to the sufficiency and efficacy of the enactment.

The argument before us was mainly directed to the question whether an act of the general assembly clothed with the prescribed forms of law and placed in the keeping of the proper depositary, as such, can be impeached and its operation avoided by evidence derived from the journals or from other extraneous sources, that the directions of the constitution were disregarded or not observed in its progress and passage through the two houses ; and if this can be done, as a corollary or consequence, if the examination shows that all constitutional provisions have been strictly pursued up to and including the announcement of ratification, will not the court interpose and require the presiding officers to perform the omitted and mere ministerial act of authenticating the

enactment with their signatures, and thus perfect in form what is already effective in substance.

The discussion of the primary question upon the solution of which the other is supposed to be dependent, has been full, able and exhaustive; and the numerous cases decided in the courts of different states before which the point was presented, brought to our attention through the industry and research of counsel, are by no means harmonious and consistent. If it were necessary in determining the present application to pass upon the competency of such impeaching evidence, we should be reluctant to assent to a proposition which leaves the existence and validity of a statute to depend upon the uncertain results of an inquiry made in each particular case, whether the provisions of the constitution directing the mode of legislative proceedings have been followed in the action of the two houses in passing a bill through its different stages of progress, when by the very act of authentication they declare that all these provisions have been observed. If such an inquiry may be entered on, (and it must be collaterally if at all, since there is no direct method of assailing and annulling a statute upon that ground) no lapse of time, no continuous and indefinite recognition of its force and acquiescence in its operation, and no non-interference by succeeding legislatures, would bar the inquiry or give stability and repose to the law itself; consequences so serious and far-reaching cannot be hazarded except upon the clearest convictions of the soundness of the principle from which they flow, and the competency and duty of the court so to declare.

In most of the cases to which we have been referred in which the competency of such evidence is maintained, the court pressed by the force of the objection avoid the consequences of its admission by holding that the requirements and restraints put upon the mode of legislative action, are only directory, and if disregarded do not affect the validity

of the act done. This is but another method of reaching the same result. For why should an inquiry be prosecuted to ascertain a fact, which if disclosed by the journals is to have no effect ?

The distinction between the cases in which the judicial power will declare an act of the legislature void, and in which it will not, is forcibly pointed out in the case of the Pacific R. R. Co. v. Governor, 23 Mo. (2 Jones) 353, by SCOTT, J., thus: " While the power of the courts to declare a law unconstitutional is admitted on all hands as being necessary to preserve the constitution from violation, yet such power is claimed and exercised in relation laws which on their face show that the constitutional limits have been transcended." * * * "If the legislature exceeds its powers in the enactment of a law, the courts being sworn to support the constitution must judge that law by the standard of the constitution and declare its validity. But the question whether a law on its face violates the constitution is very different from that growing out of the non-compliance with the forms required to be observed in its enactment. In the one case a power is exercised not delegated or which is prohibited, and the question of the validity of the law is determined from the language of it. In the other the law is not in its terms contrary to the constitution; on its face it is regular, but resort is had to something behind the law itself in order to ascertain whether the general assembly in making the law was governed by the rules prescribed for its action by the constitution."

The question is thoroughly investigated and discussed in Pangborn v. Young, 32 N. J. Law Rep., 29, which is followed by the supreme court of Nevada in Nevada v. Swift, 10 Nev., 176, and all the authorities collected and reviewed. The Chief Justice thus announces the conclusion of the court in the former case: " My general conclusion then is, that both upon the grounds of public policy and upon the ancient

27

and well settled rules of law, the copy of a bill attested in the manner above mentioned and filed in the office of the secretary of state, is the *conclusive proof* of the enactment and contents of a statute of this state, and that such attested copy cannot be *contradicted by the legislative journals or in any other manner.*" And ELMER, J., concurring, says: "I am clearly of the opinion that we cannot look behind the law as it is signed and deposited among the public archives. It has thus become a record which cannot be contradicted." The supreme court of Nevada after a full examination of cases on each side of the question, sum up the result in the following words: "From this discussion it appears that the decided weight of authority as well as every consideration of expediency, is opposed to the doctrine that this or any court for the purpose of informing itself of the existence or terms of a law, can look behind the enrolled act, certified by those officers who are charged by the constitution with the duty of certifying, and therefore of course with the duty of deciding what laws have been enacted."

If such force and effect are given to an enrolled bill bearing the impress of legislative sanction, and with the prescribed authentication of its proper officers deposited for safe keeping as prescribed by law, this authentication must be by the authority of the legislature itself, which can neither be coerced nor controlled by the judicial power.

But the determination of the question is not necessary to a decision of the present application. In our opinion the signatures of the presiding officers of the two houses under and by force of the words used in our constitution, are an essential pre-requisite to the existence of the statute—the finishing and perfecting act of legislation—and must be affixed during the session of the general assembly. An enrolled bill is not that considered and adopted by the concurring action of the two houses, but is a substituted copy transcribed to take the place of the original, and becomes the final expression of the legislative will. Its accuracy is

secured by the examination, comparison and report of a committee in each house, and then each house ratifies that it accepts and adopts the enrolled bill as the embodiment of its own action and the correct expression of its will.   Ratification is the act of the house, and its presiding officer in attesting the same acts on behalf of and by its authority. This is a necessary safeguard against fraud in the insertion of new matter, or the omission or change of existing provisions in the bill, not to be lost sight of or surrendered. Each body gives its direct and positive sanction to the enrolled bill, as its act, when its presiding officer signs; and he is but its agent acting in its stead when he does so.   In other words this is the consummation of legislative action, which is incomplete and inoperative without it.   But the constitution in express terms makes the attestation imperative and essential.   It declares "that all bills and resolutions of a legislative nature shall be read three times in each house, before they pass into laws; and shall be signed by the presiding officers of both houses."   Art. II, § 23.   Some criticism was made in the argument as to the proper construction of the clause produced by a semicolon which disjoins the first from the last paragraph.   And it was insisted for the relator that while the three several readings were essential conditions of valid and effective action, the other provision for the signatures is not, and is directory merely. We do not concur in this rendering of the constitution. The mandate is imperative and unequivocal in both particulars; and in the old constitution of 1776, which contains a clause substantially similar, the paragraphs are separated by a comma only.   The obvious import of the entire section is to declare *what* is needful to an act of legislation, (not all that is needful to it) and should be read as if the words " before they pass into laws" were the qualification of the concluding sentence also.   This is the fair and reasonable interpretation of the section, and such must be its effect.

The construction derives support from the very nature and effect of the act of attestation itself, which as we have seen is to identify and impress the enrolled bill with the direct and distinct recognition and sanction of the body itself, of which the officer is but the official organ through whom its will is made known. It would seem that the ratification should be subscribed and attested in the presence of the house, and most certainly it cannot be done after the close of the session, at the discretion or pleasure of the officer.

"The signing of an enrolled bill by the speaker or president," says an eminent writer, "is an official act which can only be done when the house over which he presides is in session, and a quorum is present therein for the transaction of business." Cushing's Law and Practice in Legislative Assemblies, § 2374. The proposition though not fully sustained by the journal of the house of representatives of the congress of the United States, referred to, is nevertheless entitled to great weight as conveying the opinion of the author, so well versed in the rules and principles of parliamentary law.

We proceed to notice the objections to this view of the subject, made and strenuously pressed on behalf of the relator upon our attention:

1. It is said that the legislative will when clearly expressed should not be defeated by the refusal or failure of its officers to annex their formal and official certificate of a fact abundantly proved by the journals and other evidence.

The objection rests upon the fallacious idea that the legislative will, when it can be ascertained from the concurring action of the constituent parts of the general assembly, is effectual and must be enforced without regard to its manner of action. This would be to set aside all constitutional restraints, since that will could be determined as well from a single reading of the bill and vote upon it, as from the "three several readings" prescribed. So after the full con-

currence in the two houses upon any particular measure, it would be needless to have an enrolment, ratification, or attestation, because the intention embodied in the bill is manifest without them. This would open the door and expose legislation to fraudulent practices easy of accomplishment and difficult of detection. The history of legislation shows that these apprehensions are not groundless. To obviate them, the constitution prescribes certain rules to be observed in the work of legislation and a definite method of making its final action authoritatively and conclusively known, for which the judiciary is not allowed to substitute another, however reasonable and convenient it may seem to be. We can only know and enforce the will of the legislature when conveyed through the prescribed forms and with the verifications imposed by the controlling fundamental law, which is equally binding upon both departments of the government. An analogy may be found in the law relating to the execution of wills: An attorney under instructions prepares an instrument in writing to be executed as a will, and clearly expressing the intended testamentary disposition of his (testator's) estate. It is read over by him and subscribed in the presence of several witnesses. Is the writing sufficient to convey property? Certainly not. And why not, since the intention is manifest from the very act of execution, and nothing can make it more so? It is ineffectual because the law requires it to be signed by him in the presence of at least two witnesses, and attested by them as such in his presence, and this has not been done. The attestation of the witnesses is as necessary to the operation of the instrument as a will, as are the recognition and subscription of the party himself. No other proof from witnesses who were present and know the fact will supply the want of attestation. The purpose of the law is to prevent fraud and imposition, and to identify the paper and the words it contains as the act of the testator. For similar

reasons, certain forms are prescribed regulating legislative proceedings, and for the full and final verification of what is done, which can no more be dispensed with than the essential pre-requisites of a testamentary writing. It is through the observance of these, and in this way only, that the individual will in the one case, and the collective will in the other, can be legally and conclusively made known and rendered effectual.

2. The next objection is, that if the validity of a statute depends upon the signatures of the presiding officers, they may by withholding their names defeat legislation; and thus is vested in each one a vetoing power, which under our system is denied to the executive even.

It is true the act of signing is ministerial in the sense that the duty is absolute, and its performance under the authority of the body, a positive obligation. And so is every act of a legislative assembly which must be carried into effect by its presiding officer in a form of a precept or otherwise. Indeed his official conduct is regulated and controlled in the absence of a higher authority by rules of its own making, which he and others must alike obey. If the speaker chosen by the members of the house under the constitution article two, section eighteen, becomes incapacitated or refuses to discharge the necessary functions of his office and execute its lawful orders, the power undoubtedly resides in the body to enforce its authority by the permanent or temporary substitution of another who can and will perform them. In other words, the house possesses the inherent ability and right to enforce its authority and maintain its essential prerogatives and the use of the means necessary thereto. "The presiding officer," says the author already quoted, "being freely elected by the members by reason of the confidence which they have in him, is removable at their pleasure in the same manner whenever he becomes permanently unable by reason of sickness or otherwise to

discharge the duties of his place and does not resign; or whenever he has in any manner or for any cause forfeited or lost the confidence upon the strength of which he was elected." § 299. In reference to the presiding officer of the senate who is not a member of that body and not elected by the senators, the same author adds: "The power to choose one of their own members a temporary presiding officer in case of the absence or other disability of the officer designated, though expressly given in most cases, is a necessary incident to a parliamentary assembly in this country, and would be considered as given unless withheld; and upon such temporary presiding officer, the assembly may confer what authority they please." § 308. It seems equally necessary that the same power should be exercised in case of a persistent and wilful refusal as of an inability to act. But if this were otherwise and the only redress for such official misconduct and dereliction of duty is to be found in the process of impeachment, it would not disturb the soundness of the principle. There are moral obligations resting upon conscience only, incapable of enforcement by the legitimate exercise of judicial power, and the court is not at liberty to resort to unusual and arbitrary methods to overcome a pressing exigency supposed to exist and accomplish some desired end, and thus invade the jurisdiction of another coordinate department. If the law makes no provision for such an emergency, it is because it will not assume that an officer will wantonly disregard a plain mandate of the constitution which he has sworn to support; and, if he should, that the mischiefs of a judicial interference for correction will outweigh the evil consequences of the wrongful act or omission. Referring to the question of interference with legislation, THURMAN, J. delivering the opinion in *Miller* v. *The State*, 3 Ohio State Rep., 475, uses this language, which is applicable to the point: "If it be said, as was said in the argument, that this leaves the assembly at liberty to disre-

gard the constitution, the answer is obvious, that a disposition to disregard it is no more to be imputed to the legislative than to the judicial department of the government, and ought not to be imputed to either." The same remark may be applied with equal propriety to their presiding officers.

3. It is further insisted that affixing the official signatures to a bill that has passed is a duty strictly ministerial and falls under coercive judicial authority, as in the case of *Cotten* v. *Ellis*, 7 Jones, 545. The cases are not parallel, and they differ in that the duty required of the governor was not only ministerial and direct, but involved his own individual and independent action; while that demanded of the others must be performed under the supervision and control of a body which by adjournment and until it may reassemble, is incapable of exercising that supervisory control. If the general assembly were in session, each house is competent to take such action as is necessary to secure the legal authentication of its act, and the interposed authority of the court might produce a conflict of jurisdiction; and if not admissible then, why should it be invoked after an adjournment? Can it be inferred from the fact that the signature was not given nor required that the assembly intended to do what was then done? and how is this intent to be judicially arrived at and upon what evidence determined? Insuperable difficulties are presented in the prosecution of such an inquiry with a view to any remedial action, and the court will not enter upon it. But the failure to enact a useful law, not very uncommon in the hurry and confusion incident to the closing days of a session, from the omission of something material to its validity, is not an irremedial evil. It is but a postponement to another session, and the intervening space may be shortened if the public interests require by an executive call for an earlier meeting.

In this connection another aspect of the case may be considered, distinguishing between the consequences of legisla-

tive and judicial action. A judgment is binding between parties and privies and can be impeached only by a direct proceeding at the instance of one or more of them, aimed at reformation or correction. The correction of injurious legislation in which representatively every citizen is a party, is left to a succeeding legislature and the remedy is ample and unrestricted. Only such rights and interests as have meanwhile vested under the law, are protected from its power and placed beyond its reach.

Our attention was called to the argument of plaintiff's counsel to an expression found in the opinion in *Gatlin* v. *Tarboro*, 78 N. C., 119, in which RODMAN, J., says : " If it appeared from the act itself or affirmatively appeared from the journals of the legislature, which would have been competent evidence, that notice of the intended application for the act (*private*), which the constitution requires, had not been given, *we should probably hold the act void.*" Yet in this very case it was admitted that no such notice had been given, and hence there could be no issue and no controversy about the fact, and the admission was held insufficient to warrant the court in declaring the act void for the defect. The remark of the able judge was a *dictum* merely, in no manner necessary in the determination of the cause; and if not an inadvertence, is clearly repugnant to what is declared by the Chief Justice in *Brodnax* v. *Groom*, 64 N. C., 244: " We do not think it necessary," say the court, " to enter into the question whether this is a local public act or a mere private act, in regard to which thirty days' notice of the application must be given; for taking it to be a mere private act, we are of opinion that the *ratification certified by the lieutenant governor and the speaker of the house of representatives makes it a matter of record which cannot be impeached before the courts in a collateral way.*" LORD COKE says " a record until reversed importeth verity."

The constitution declares that the legislative, executive and supreme judicial powers of the government ought to be forever separate and distinct from each other. Art. I, § 8. And if the nature and effect of an enrolled bill duly certified and deposited in the proper office, be such as we have attributed to it, it unavoidably follows that the compulsory order demanded in the action would be an interference with the legitimate exercise of the law-making power and an obstruction to the harmonious working of the "separate and distinct" coördinate departments of the government, and must consequently be denied.

We cannot undertake to examine all the numerous references made in the argument without extending the opinion to an unreasonable length, and shall notice such of the cases as seem mainly to be relied on by the plaintiff and bear most directly on the point under consideration.

In *Speer* v. *Plank Road Co.*, 22 Penn. St. Rep., 376, the validity of a statute under which the defendant derived its corporate existence was called in question, because it lacked the signatures of the speakers though it had regularly passed both houses of the legislature, been approved by the governor, and enrolled in the proper office. The statute was held to be valid and the court say : "There is nothing in the constitution requiring the signatures of the presiding officers of the two houses to be annexed to a bill preparatory to its becoming a law. Neither is there any general statute to this effect. Each branch of the legislature *by its own rules* has adopted this as a safe and convenient method of signifying to the governor what bills are ready for his approval or rejection, and for this purpose the practice is one of great utility, serving as it does *to guard against mistake or imposition ;* but the signatures are no part of the law-making power and their non-observance detracts nothing from the force of the enactment." The case simply decides that rules prescribed by a parliamentary body for the regulation of its own pro-

ceedings have not the force of a constitutional command to avoid the results of its final action, and hence it can have no application.

In *People* v. *Bowen,* 30 Barb., 24, a bill had been passed by the general assembly of New York and sent to the governor who approved and signed the bill three days after its final adjournment. It was insisted that under the constitution which contains a clause similar to that in the constitution of the United States, the approval must be given during the session, and that the act was therefore inoperative. The court held the approval to be sufficient and sustained the law, declaring the power of approval and of rejection vested in the governor, to be, "not a legislative but an executive revisory act, implying in its exercise, time, examination and judgment." Whatever weight may be due to this construction (and it is at variance with the practice under the similar clause in the constitution of the United States, as is admitted in the opinion) it is not pertinent to the present inquiry and may be dismissed without further comment.

In *Com'rs of Leavenworth* v. *Higginbotham,* 17 Kan., 62, the defendant brought his action to recover the value of certain bonds issued by the county of Leavenworth to the Union Pacific railroad company under an act the validity of which was contested in the defence, on the ground that the signature of the presiding officer of the senate was wanting. The court overruled the objection and say: "It (the bill) contains a certificate and signature of the secretary of the senate, showing that the bill passed the senate, the certificates and signatures of the speaker and chief clerk of the house, showing that it passed the house, and inferentially that it passed the senate; and the signature and approval of the governor, which inferentially shows that it passed both houses. The bill has been published as a law by the secretary of state, both in a newspaper and in the statute-book, (Laws of 1865). It has subsequently been recognized as a

law by the legislature and the governor, (Laws of 1866) and also by the courts, (7 Kan., 479, 576); and indeed·it has generally been recognized to be as much a law as any other law on the statute-book; and the question that it was not duly passed or signed has never been raised until recently, although it has been on the statute-book for over eleven years.     We think the mere failure of the president of the senate to do his duty cannot have the effect to invalidate the law." It is true in the discussion it is said that the signatures of the presiding officers are "only portions of the many evidences of the due passage and validity of the bill," and that a bill may in some instances "be valid although the signature of one of the presiding officers may be omitted," yet assent to the correctness of these general propositions is not necessary to sustain the decision.     Beside the reasons so forcibly stated, it may be that the governor's approval, which can alone be given to a measure which has .regularly passed both houses of the assemby and is therefore a determination of that fact, is sufficient evidence of the action of that body, even without the concurring certificate of one of the officers.     However this may be, the case is not an authority to show that a bill, having neither the signature of either presiding officer nor any subsequent legal sanction, can be upheld as effective or can be made complete by the order of the court.

Our remarks have been directed to general legislation and the legal provisions applicable thereto.     We do not mean to say there are no exceptions to the rule which forbids inquiry into the regularity of legislative action for the purpose of impeaching the validity of a properly certified, attested and enrolled bill.     It may be that where special limited power to pass certain acts is conferred, to be exercised under conditions essential to their validity, and especially when evidence of compliance with those conditions is required to be entered upon the journals, as provided in article two, section

four, the court may be compelled to look to the journals in order to determine the constitutionality of the act upon the ground taken in the case from Missouri. (*Pacific R. R. Co.* v. *Governor, supra*). Upon this we express no opinion and leave the question open for determination when it may hereafter arise and become necessary to decide it.

We therefore reiterate the announcement, made verbally heretofore, of the conclusions at which we have arrived: First, the signatures of the president of the senate and speaker of the house, by the express command of the constitution, must be affixed to an act of legislation, during the session of the general assembly, and are necessary to its completeness and efficacy: Second, the judicial power cannot be exercised in aid of an unfinished and inoperative act, so left upon the final adjournment, any more than in obstructing legislative action.

We simply advert to the frame of this action seeking in one proceeding to enforce separate personal duties upon each defendant and prosecuted by a single relator, having no peculiar separate personal interest in the subject matter of controversy, instead of at the instance of the public, to say, that we do not wish our silence to be interpreted as giving it our approval. Our purpose is to settle the controversy upon its merits, and the form of proceeding has not been considered.

We therefore declare there is error, and that the relator is not entitled to relief in the premises and the action must be dismissed, and it is so ordered.

Error.                              Action dismissed.