ELIAS CARR v. OCTAVIUS COKE, Secretary of State.

*Statutes — Enactment — Ratification — Presiding Officers' Signatures Fraudulently Procured or Affixed through Mistake.*

When it appears that a bill has been duly signed by the presiding officers of the two Houses of the General Assembly, declaring it to have been read three times in each House, the Courts cannot go behind such ratification to inquire whether it was fraudulently or erroneously enrolled before it had been passed after the requisite readings by each House, although the Journals do not show that it was so passed.

(*Avery and Clark, J. J.,* dissent, *arguendo.*)

ACTION by Elias Carr against Octavius Coke, Secretary of State, for a mandamus, &c., heard before *Starbuck, J.,* at April Term, 1895, of WAKE Superior Court.

Complaint was as follows:

"The plaintiff, in behalf of himself and all other citizens of the State of North Carolina, complaining, alleges:

"1. That defendant is Secretary of State of North Carolina, and by virtue of his office has the custody of all the Acts passed by the Legislature of 1895, or which purport to have been passed by it.

"2. That it becomes his duty by law to deliver certified copies of said acts to the Public Printer of said State for printing and publication.

"3. When so printed and published, they become presumptive evidence that they are laws duly and constitutionally enacted.

"4. On the 13th day of March, Anno Domini 1895, a bill was signed by the President of the Senate and Speaker of the House of Representatives in the Legislature of North Carolina at its last session, in the presence of each House, and purports to have been ratified upon that day, which reads as follows:

"AN ACT TO REGULATE ASSIGNMENTS AND OTHER CONVEYANCES OF LIKE NATURE IN NORTH CAROLINA.

"*The General Assembly of North Carolina do enact:*

"SECTION 1. That all conditional sales, assignments, mortgages or deeds of trust, which are executed to secure any debt, obligation, note or bond which gives preferences to any creditor of the maker, shall be absolutely void as to existing creditors.

"SECTION 2. That all laws in conflict with this act are hereby repealed.

"SECTION 3. That this act shall be in force from and after its ratification.

"Ratified the 13th day of March, A. D. 1895.

CARR *v.* COKE.

"5. The said bill, as this plaintiff is informed and believes, was not enacted a law in accordance with the provisions of the Constitution of this State.

"6. The Journals of both Houses of the Legislature show that it was not read three times in either House.

"7. The Journal of the Senate shows that it was never read before that body, and never passed any reading in it.

"8. The Journal of the House of Representatives shows that it was introduced in that body and referred to a committee. The said committee reported it back to the House with an amendment and is silent as to its passage; the bill was laid on the table on its second reading in that body on the 12th day of March, Anno Domini 1895. This appears also in the entries upon the calendar of bills of the House.

"9. The bill is marked and stamped "Tabled 12th day of March, Anno Domini 1895." The affidavit of Ellington is hereto attached and prayed to be taken as a part hereof.

"10. It is now deposited among the tabled bills in their proper receptacle in what is known as the old State Library in the Capitol.

"11. By some means unknown to this plaintiff, but which he is informed and believes to be fraudulent, the said bill was enrolled by some person to this plaintiff unknown, in the office of the Enrolling Clerk and signed by mistake by the President of the Senate and Speaker of the House of Representatives upon the day upon which it purports to have been ratified.

"12. The copy of the enrolled bill purporting to have been ratified, as above stated, is now in the custody of the defendant, the Secretary of the State of North Carolina.

"13. The said defendant, in performance of the duty by law imposed upon him, is compelled to deliver for printing and publication to the Public Printer of this State a certified copy of said fraudulent act to be published and

printed as an act of the Legislature of 1895, unless restrained from so doing by order of this Court.

"14. The said defendant now threatens and declares his intention to so deliver a certified copy of the said fraudulent act to the Public Printer to be published and printed as aforesaid.

"15. The act when so printed and published becomes presumptively an act of the Legislature, duly enacted, and a valid law of the State.

"16. This plaintiff is informed and believes that after such printing and publication there is no legal method by which such presumption can be rebutted in the Courts of this State, as long as said act remains in the custody of the Secretary of said State, filed with the acts of the Legislature legally passed by it.

"17. The plaintiff is a resident and citizen of the State of North Carolina and owns property within said State over and above his homestead and personal property exemptions; he proposes to reside in said State hereafter, and he in common with many other citizens will be injured in his right of alienation of his property if said fraudulent act of the Legislature is printed and published in the manner above stated or remains in the custody of the said Secretary of State, filed with acts of the Legislature as above set forth. That he is a creditor of debtors who are indebted to others and will be deprived by the said act of the right to secure debts so due him by mortgage, conditional sales, deeds of trust or assignments, unless the relief prayed for in this complaint is granted.

"18. That a summons, together with a copy of this complaint, has been served on defendant in this action.

"Wherefore, the plaintiff prays that an order be made by this Court directing said defendant Secretary of State to show cause why a peremptory mandamus shall not be

CARR v. COKE.

issued against him to compel him to remove the said act from the files of the law required to be kept by him, and why he should not be enjoined from delivering a certified copy of said act to the Public Printer of this State to be printed and published as a law of this State.  And the plaintiff further prays that the said defendant may be restrained in the meantime from delivering a certified copy of said act to the Public Printer to be printed and published as aforesaid, and demands such other and further relief as the Court may adjudge that he is entitled to in the premises, and asks that this complaint may be treated as an affidavit for the purpose of obtaining the temporary restraining order for which he prays."

The following affidavit was attached to the complaint: ·

"J. C. Ellington makes oath that he is State Librarian of the State of North Carolina and was such at the time of the searches mentioned below.

"That on or about the _____ day of March, 1895, after the Legislature adjourned, and several times thereafter, he made most diligent and thorough search in the office of Enrolling Clerk of the last General Assembly of North Carolina for the document from which the paper now in the office of the Secretary of said State was copied, which purports to be an act to regulate assignments and other like conveyances in North Carolina and to have been ratified on the 13th day of March, 1895, and that the same could not be found and has not since been found therein.

"He further maketh oath that he has carefully examined the calendar of the Senate of the last General Assembly of North Carolina for the entire session and it contains no reference to, or mention of said bill or act either by number or title of any similar bill.

"He further maketh oath that he has most carefully examined the Journal of the proceedings of the House of

CARR *v.* COKE.

Representatives of the said General Assembly from the 20th day of February, 1895, to the 13th day of March, 1895, both inclusive ; said journals being deposited in the office of, and now in the custody of, the Secretary of State of North Carolina, and that he found the following entries on the Journal of the proceedings of the said 20th day of February. (See page 12, House Journal, February 20, 1895.)

### "INTRODUCTION OF BILLS.

"By Mr. Smith, of Stanly, H. B. 1018: A bill to be entitled an act to regulate assignments. Referred to the Finance Committee."

"That he finds nothing else on said Journal of that day touching the said bill or act, or any similar bill or act.

"He further maketh oath that he found on the Journal of the proceedings of said House on the 21st day of February, 1895, the following entries: (See page 8, House Journal February 21, 1895.)

### "REPORTS OF COMMITTEES.

"By Mr. Hileman, from the Committee on Finance : H. B. 1018, a bill to be entitled an act to regulate assignments, with a favorable report."

" That he found nothing else on said Journal of that day touching the said bill or act, or any similar bill.

"He further maketh oath that he found on the Journal of the proceedings of said House on the 28th day of February, 1895, the following entries: (See House Journal February 28, 1895.)

"On motion of Mr Smith, of Stanly, H. B. 1018: A bill to regulate assignments is made the special order for 8:30 p. m., Friday."

" That he found nothing else on the Journal of that day touching said bill or act, or any similar bill or act.

CARR *v.* COKE.

" He further maketh oath that there is no entry on said Journal of any act concerning the said bill or any similar bill on the Friday for which it was made a 'pecial order.'

"He further maketh oath that he found on the Journal of the proceedings of said House on the 13th day of March, 1895, being the day of final adjournment, the following entry :

"Mr. --------------, from the Committee on Enrolled Bills, reports the following bills and resolutions as properly enrolled, which were duly ratified and sent to the office of the Secretary of State :  'An Act to Regulate Assignments.'

" That there are no other entries on the days referred to nor on any other day between the 20th day of February and the 13th day of March, 1895, except those mentioned, touching said bill or act, or any similar bill or act.

" He further maketh oath that he has carefully examined the Journal of the Senate of the last General Assembly for the corresponding dates and that he finds no reference to said bill or any similar bill either by number or title, and that the same doth not appear on said Journal among the bills reported as ' enrolled and ratified.'

" That he found the bill, a copy of which, with *fac simile* copy of endorsements, is appended to and made a part of this affidavit, among the tabled bills in the old library room in the capitol, where legislative documents are filed.

" J. C. ELLINGTON."

"Sworn to and subscribed before me this 29th day of April, 1895.

( SEAL. )                    W. T. SMITH,<br>*Notary Public.*"

CARR *v.* COKE.

AN ACT ENTITLED AN ACT TO REGULATE ASSIGNMENTS AND OTHER CONVEYANCES OF LIKE NATURE IN NORTH CAROLINA.

*The General Assembly of North Carolina do enact:*

SECTION 1. That all conditional sales, assignments, mortgages, or deeds in trust which are executed to secure any debt, obligation, note or bond which gives preference to any creditor of the maker, shall be absolutely void as to existing creditors, except those given to secure cash advanced at the time of the execution of the same or to secure advancements for farming purposes.

SECTION 2. That all laws in conflict with this act are hereby repealed.

SECTION 3. This act shall be in force from and after its ratification.

The Finance Committee report this bill favorably with the following amendment, recommended by the committee.

HILEMAN.

" Amended by striking out in section one all after the word ' creditors ' in line five of said section."

On the back of said act is endorsed the following:

" H. B. No. 1018.    .                     S. B. No. _____

By R. L. Smith.                                        ·

A bill to be entitled an act to regulate assignments.

Passed first reading February 20th, 1895.    Committee on Finance.

Passed House _____, 189____.

Favorable report February 21, 1895.

Engrossed _____.

Tabled March 12, 1895.

_____,

*Engrossing Clerk.*

CARR *v.* COKE.

Special Order Friday evening 8:30.
Sent to Senate _____, 189____.

                         _____,
                              *Clerk of House.*

Defendant moved to dismiss the action on the ground that the Court had no jurisdiction to grant the relief asked by plaintiff.

His Honor rendered the following judgment :

This action coming on for further orders and being argued by counsel and considered by the Court it is, on motion of attorneys for defendant, ordered and adjudged by the Court that this action be dismissed for want of jurisdiction of the Court to grant the relief prayed for in the complaint, on the ground that the Court cannot go behind the ratification of the act as the same appeared in the office of the Secretary of State, and the defendant recover his costs, to be taxed by the clerk, of the plaintiff and his surety for costs.

The plaintiff excepted to the ruling and judgment of the Court, assigning error as follows :

"1. For that His Honor ruled that the Court did not have jurisdiction of the subject matter of the controversy.

"2. For that His Honor ruled that the complaint did not set forth facts sufficient to constitute a cause of action.

"3. Because His Honor did not rule that it was the duty of the Court to inform itself by any legitimate source of information within its reach, especially by the Journals of both Houses of the General Assembly, of the existence and passage of the act in controversy.

"4. For that His Honor erred in not continuing the injunction until the hearing, and in not hearing any evidence upon the question of the passage of the act.

"5. For that His Honor erred in deciding that the mere presence of the act in the office of the Secretary of State,

signed by the presiding officers of both houses, was absolutely conclusive upon the judicial department, and that the Courts could not look behind the ratification of the said act."

*Messrs. F. H. Busbee* and *Graham, Boone & Boone*, for plaintiff (appellant).

*Messrs. J. B. Batchelor* and *Armistead Jones*, for defendant.

FAIRCLOTH, C. J.: The plaintiff, as a citizen and taxpayer of the State, brings this action against the defendant as Secretary of State, who by virtue of his office is the custodian of all Acts passed by the Legislature, or which purport to have been passed, whose duty it is to deliver certified copies of said Acts to the Public Printer for publication. The prayer is that the defendant show cause why a peremptory mandamus shall not issue to compel him to remove the act under consideration from his files, and why he should not be enjoined from delivering a certified copy of the same to the Public Printer. An act to regulate assignments and other conveyances of like nature in North Carolina, ratified March 13, 1895, is the one under consideration.

The complaint alleges that the Act was signed by the President of the Senate and the Speaker of the House of Representatives on the said 13th of March in the presence of each House, and purports to have been ratified upon that day; that, upon information and belief the act did not become law according to the Constitution of the State. That the journals of both Houses show that it was not read three times in either; that it was never read in the Senate, and was tabled in the House on its second reading; and that by some unknown fraudulent means the bill was enrolled by some person, unknown to the plaintiff, and signed by the said President and Speaker by mistake.

The defendant answered denying the material allegations.

At the hearing the defendant moved to dismiss the action on the ground that the court had no jurisdiction to grant the relief prayed for by the plaintiff. The motion was heard and His Honor dismissed the action for want of jurisdiction to grant the relief on the ground that the court cannot go behind the ratification of the act as the same appeared in the office of the Secretary of State. With the act before us, on its face regular and in due form, ratified by the genuine signatures of the President of the Senate and Speaker of the House, the question is presented, Can the Court, as a co-ordinate branch of the Government, look behind this record and investigate by inquiry and proof the manner in which this record was established by the legislative branch of the Government, for any of the causes alleged in the complaint?

It may be stated in the outset that it is an important question and one that has not been heretofore presented directly to this Court.

The Court cannot be blind to the consequences that will flow from a decision either way. On the one hand, if we cannot look behind the record, then, paid and corrupt men, lobbyists and other interested ones in and around the legislative halls, will feel more confident and safer in their disreputable work. On the other hand, if we can open the door and permit every act of the legislature to be inquired into, behind the record, for any of the causes alleged in the complaint, then the State will be plagued with all the evils of a veritable Pandora's box. By an examination of the decisions of the courts of the different States, we find some diversity among the decisions and the opinions of eminent jurists. Those courts, holding the affirmative of the question, as a rule have done so by reason of some provision in

CARR *v.* COKE.

their State Constitutions or some pre-existing statutes. In one or more States the negative was held, and after a change in their Constitutions the reverse was held by reason of some new clause in the organic law.

We find in no State Constitution the exact wording as it is in ours. We are therefore left to reason with ourselves, and construe the true meaning of our organic law, aided by the best authorities at our command.

Let it now be understood that it is not a question of fraud or wrong-doing in the Legislative halls, as alleged in the complaint, with which we are confronted, but simply a question of power. It cannot be said that this Court from its origin until now has ever failed to lay its hands upon fraud or any wrong-doing, whenever authorized by law and requested to do so. If crimes are perpetrated in legislation, the authors are liable and can be punished as other violators of the law, and possibly a reasonable and honest effort by the proper authorities would bring to light the authors of the wrong, if any has been done. There is now before the Court in this proceeding no one who is in the slightest degree alleged or supposed to be connected with wrong-doing in this matter. So, then, we are considering a question of power, and not of investigation behind the record of a co-ordinate branch of the State Government.

Our Constitution, Art. 2, Sec. 16, declares that: "Each House shall keep a journal of its proceedings which shall be printed and made public immediately after the adjournment of the General Assembly," and in Section 23, "All bills and resolutions of a Legislative nature shall be read three times in each House before they pass into laws; and shall be signed by the presiding officers of both Houses." What shall be the entries on the Journals is not indicated by the Constitution, except as above. It is the province and duty of the Court to construe and interpret Legislative

CARR v. COKE.

acts, and see if they disregard or violate any provision of the Constitution, and if so found, to declare them invalid, and this is done upon the face of the Act itself. Beyond this duty arises the question of power in the Court to look behind the legislative record and inquire into its proceedings for any cause set out in the complaint. Our decision upon this question is based upon the "reason of the thing", upon public policy for the best interests of the State, and upon the decisions of other courts and our own, which commend themselves to our minds, some of which are now cited.

At common law the ratification and approval of an act of Parliament was conclusive and unimpeachable, etc. "An Act of Parliament, thus made, is the exercise of the highest authority that this Kingdom acknowledges upon earth." "And it cannot be altered, amended, dispensed with, suspended or repealed, but in the same forms and by the same authority of Parliament; for it is a maxim in law that it requires the same strength to dissolve, as to create an obligation." 1 Blackstone Com., 185–6. "The journal is of good use for the intercourses between the two Houses, and the like, but when the Act is passed the journal is expired. The journals of Parliament are not records, and cannot weaken or control a statute, which is a record and to be tried only by itself." Rex v. Arundel, Hobart, 109–111, Trinity Term, 14 Jac. Broadnax v. Groom, 64 N. C., 244, was a question upon a private act requiring 30 days' notice of application, required by Art. II, Sec. 4, (now Sec. 12) of the Constitution, and the motion was to prove that the notice had not been given. PEARSON, C. J., said : "We are of opinion that the ratification certified by the Lieut. Governor and the Speaker of the House of Representatives makes it a 'matter of record,' which cannot be impeached before the Courts in a collateral way. Lord Coke says, 'A record

until reversed importeth verity.' There can be no doubt that acts of the Legislature, like judgments of courts, are matters of record, and the idea that the verity of the record can be averred against in a collateral proceeding is opposed to all of the authorities. The courts must act on the maxim, '*Omnia presumuntur*, &c. Suppose an Act of Congress is returned by the President with his objection, and the Vice-President and Speaker of the House certify that it passed afterwards by the Constitutional majority, is it open for the courts to go behind the record and hear proof to the contrary ?"

In *Scarborough* v. *Robinson*, 81 N. C., 409, in which this question was not directly before the Court, SMITH, C. J., in the discussion uses this language on page 426 : "The Constitution declares that the legislative, executive and Supreme Judicial powers of the government ought to be forever separate and distinct from each other. Art. I, Sec. 8. And if the nature and effect of an enrolled bill, duly certified and deposited in the proper office, be such as we have attributed to it, it unavoidably follows that the compulsory order demanded in the action would be an interference with the legitimate exercise of the law-making power and an obstruction to the harmonious working of the separate and distinct co-ordinate departments of the government, and must consequently be denied." We quote this extract in order to show the trend of the judicial mind of the Court as then constituted. In *Field* v. *Clark*, 143 U. S., 649 (1891) the question was elaborately argued and considered in an able opinion. The allegation was that an important section in the bill as it passed was not in the enrolled bill authenticated by the signatures of the Speakers and deposited in the office of the Secretary of State. After full consideration of the numerous points argued, the Court held as follows : "The signing by the Speaker and

by the President of the Senate, in open session, of an enrolled bill is an official attestation by the two Houses of such bill as one that has passed Congress; and when the bill thus attested receives the approval of the President and is deposited in the Department of State according to law, its authentication as a bill that has passed Congress is complete and unimpeachable. It is not competent to show from the journals of either House of Congress that an Act so authenticated, approved and deposited, did not pass in the precise form in which it was signed by the Presiding officers of the two Houses and approved by the President."

The argument was pressed that a bill signed by the Speakers and approved by the President and deposited with the Secretary, as an Act, does not become a law if it had not in fact been passed by Congress. The Court said, in view of the express requirements of the Constitution, the correctness of this general principle cannot be doubted. "But," said the Court, "this concession of the general principle does not determine the precise question before the Court; for it remains to inquire as to the nature of the evidence upon which a court may act, when the issue is made as to whether a bill, asserted to have become a law, was or was not passed by Congress. This question is now presented for the first time in this Court."

"We cannot be unmindful of the consequences that must result if this Court should feel obliged to declare that an enrolled bill, on which depends public and private interests of vast magnitude, which has been duly authenticated by the presiding officers and deposited in the *archives as an Act of Congress* was not in fact passed, and therefore did not become a law." Page 670. Although the Constitution does not require that Acts of Congress shall be authenticated by the Speakers' signatures, the Court said that "Usage, the orderly conduct of legislative proceed-

ings, and the rules under which the two bodies have acted since the organization of the Government, require that mode of authentication," and when a bill is so authenticated "it carries on its face a solemn assurance by the legislative and executive departments that it was passed by Congress. The respect due to co-equal and independent departments requires the judicial department to act on that assurance, leaving the courts to determine whether the Act so authenticated is in conformity with the Constitution." Page 372. "It is admitted that an enrolled act thus authenticated is sufficient evidence of itself, nothing to the contrary appearing upon its face, that it passed Congress." Page 672.

In *Pangborn* v. *Young*, 32 N. J. Law, 29, BEASLEY, C. J., delivered a strong opinion against the affirmative of the present question, and Judge Harlan says: "The conclusion was that upon grounds of public policy as well as upon the ancient and well settled rules of law a copy of a bill bearing the signatures of the presiding officers of the two Houses and in custody of the Secretary of State, was conclusive proof of the enactment and contents of a statute, and could not be contradicted by the legislative journals or in any other mode," page 674, and other cases.

In *ex parte* Wren, 63 Miss., 512, is found a case much in point, in which CAMPBELL, J., in an able and vigorous opinion, said that an enrolled act, such as we are considering, " is the sole exposition of its contents and the conclusive evidence of its existence according to its purport, and it is not allowable to look further to discover the history of the Act or ascertain its provisions. Every other view *subordinates* the legislature and disregards that co-equal position in our system of the three departments of Government." He then shows that, if such a rule should prevail a justice of the peace and all other judicial officers would be

compellable and would have the right to investigate the question whether any legislative act was passed according to the requirements of the Constitution and whether it was procured by mistake, fraud or otherwise, and upon the complaint of any resident tax-payer.

With these authorities we are content. There are numerous others but it would be useless to pursue them. We are considering the main and important question which we understand the plaintiff intended to bring to the attention of the Court, without any remarks on the pleadings. It seems to be conceded that the main allegation cannot be established by the journals as evidence, and that consequently it must be done by some other kind of proof. It is urged that fraud vitiates every thing, but if we can go behind the record, would not mistake, bribery, &c., serve equally as well? It is also argued that the fraud alleged is admitted and is therefore to be taken as a fact for the purposes of this action. Admitted by whom? The respondent does not admit it in his answer. The motion was to dismiss for want of jurisdiction and the Court rendered its decision expressly on that ground. The defendant is a mere ministerial State officer who was not a member of the legislature and has no authority from it to plead or admit anything for it. Is he authorized by the Speakers of the two Houses to admit that they signed the bill by mistake? They have made no such admission so far as this record discloses and they have no opportunity to admit or deny anything. Is the defendant authorized to admit that by some unknown and fraudulent means the bill was enrolled? If so, who authorized him to admit it? The defendant might have ignored this proceeding entirely without the slightest dereliction of duty. Who then defends the legislature or its Speakers when this grave question is under consideration? The Executive does not feel it his duty to

CARR *v.* COKE.

defend in the matter, presumably because he is not author-
ized by any one to do so.   Then, is there such admission of
fraud or any other wrong as to enable the Court to treat
the allegations of the complaint as facts?   But, however
these matters are, we have seen that we have no power to
make the order asked for by the plaintiff, and that the
remedy, if any is needed, is with the legislative branch of the
State Government.

We are of opinion that His Honor committed no error
and his judgment is affirmed.

Affirmed.


MONTGOMERY, J. ( concurring ):  The single question for
decision is, can this Court inquire into and pass upon the
history of a paper writing which purports to be an Act of
the General Assembly and which is authenticated by the
undisputed and genuine signatures of the President of the
Senate and the Speaker of the House of Representatives?
It is to be always kept in mind that the point is not as to
the powers of the Supreme Court to pronounce a law, which
is admitted to have been enacted, void by reason of its
unconstitutionality.   Our jurisdiction in that case would
be complete and unchallenged.   But the question is, when
the legislature has solemnly certified to a fact, that is, to the
passage and ratification of an act which is within its own
sphere, will the judiciary be permitted to inquire into or
dispute that certification?   The case is of the very first
impression and it ought to be settled upon the principles
of sound reason and well considered authority.   This is a
strictly legal question and ought to be settled according to
the principles of the law.   The Court is aware that its
judgment in this case may be attended with dangers in the
future, but it is not our province to provide against dangers
to the Commonwealth further than to construe honestly

CARR *v.* COKE.

and as intelligently as we can, the laws which the Legislative Department of the government has enacted. It may be said however, in this connection that, if policy ought to have governed the Court in this matter,—if results ought to have been anticipated—we feel that in the decision of the Court we have chosen the lesser of the two evils to be dreaded.

The question at issue brought to the light the more than possibilities of two most serious menaces to popular government. The first one, that of the power of a corruptible or incompetent clerical force or that of a depraved and hired set of lobbyists, or both together, to tamper with the Acts and proceedings of the legislature and have that certified to be law which was never in fact enacted; the second, that of the power of defeated and unscrupulous politicians, when stung by loss of office or a desire for revenge on their political enemies, to practically repeal the legislation of their successful opponents by resorts to the courts upon mere allegations that there was fraud in the passage of the acts or in their ratification, and by procuring injunctions upon affidavits obtained possibly through bribery or through the ignorance or carelessness of the oathmaker. By the decision of the Court the latter danger, the far most to be dreaded, is avoided. The presiding officers of the two Houses may, by taking a sufficiency of time and by close scrutiny and rigid examination of the bills and wrappers, prevent fraud and error in ratification, if such a thing be attempted; while for the latter danger no limit or restraint can be found except in the conscience of men who have never cultivated a sense of either generosity or justice. The motives and purposes of the plaintiffs in this action are not intended to be reflected on, neither is the character or official conduct of any officer or clerk of the last General Assembly. No testimony has been heard in the case and

116—16

this Court knows nothing of the facts or motives. We have simply discussed dangers in the future, in this connection. In the conclusions to which I have arrived I have tried to keep before me the great importance of the legal question involved, and to keep out of mind, as an utterly insignificant feature of the case, the wretched creatures who would commit such a detestable piece of meanness as the complaint charges. They, when detected, will receive the execration of all good men and most richly will they deserve it. It would have been well for the people and for the cause of good government if they had, or could have been ferreted out and named in the complaint that they might have been pilloried in an indignant public sentiment. But to the law in the case:—

Of the three co-equal departments of our government, the Legislative is of the most importance. It is sovereign as long as it keeps within the bounds of the Constitution. The powers of the Judicial Department are clearly defined and limited in the Constitution. Except to hear claims against the State (and then only to recommend action to the General Assembly) the whole power of this Court is embraced in these words: "The Supreme Court shall have jurisdiction to review upon appeal any decision of the Courts below upon any matter of law or legal inference." Const., Art. IV, Sec. 8. This means, in plain English, that this Court can construe the laws when their meaning is a matter of contention between litigants, and that it can determine in cases properly before it whether or not statutory enactments are constitutional. The writer of this knows of no other instances in which this Court can directly or indirectly pass upon the conduct of the General Assembly. As to the formulæ that are necessary to convert a bill into a law, we cannot inquire, if the ratification in proper form appears and the signatures of the proper offi-

cers are duly attached. However, in the case before us, the plaintiff alleges that what he styles the pretended Act is not a law because it was not read three times in each House before it received the signatures of the presiding officers of both, as the Constitution requires. That instrument certainly does require that "All bills and resolutions of a Legislative nature shall be read three times in each House before they pass into laws; and shall be signed by the presiding officers of both Houses," and it is as equally certain under the decisions of this Court that the certificate of ratification attested by the signatures of the presiding officers carries with it the presumption conclusive, that all such bills and resolutions have been duly passed by the bodies and connot be questioned by the Courts. Suppose, as individuals, we admit, which the answer does not, that this bill did not pass its several readings, can that fact be shown in a Court of law in the face of ratification and the genuine signatures of the presiding officers certifying to the contrary? This is the naked question. Ratification gives authority to the Act. The presiding officers who upon ratification attach their signatures to a bill do it in open session, calling the attention of the members to the fact that the same is about to be signed and reading the title of the bill. When it is signed, ratification is thereupon made of it by the body through their agent, the presiding officer. It is their act and deed and nothing, not even the Journal itself, can contradict it or be used as evidence against it. Ratification is of higher dignity and of more authority than the journals kept by the Clerks. Ratification and the signatures of the proper officers presume a passage of the bill by the Legislature according to the requirements of the Constitution, and the Courts of Law—the Judicial Department—a co-equal department, are not allowed to go behind or question them. We have clear

authority for this in our own reports.    In the case of *Broad-nax* v. *Groom*, 64 N. C., 244, certain tax-payers in Rocking-ham County, in their complaint, sought an injunction against the collection of a tax levied by the commissioners under an act of the General Assembly on the ground that the act was private and was passed without the 30 days' notice of applica-tion required by the Constitution.    That case presented the very .question which we have before us now.    Could the plaintiffs in that case be allowed to go behind the ratifica-tion of the act and show. by any kind of proof—by the journals or otherwise—that the constitutional requirement had not been complied with ?    The Constitution provides that "The General Assembly shall not pass any Private Law unless it shall be made to appear that 30 days notice of appli-cation to pass such a law shall have been given."    The Con-stitution provides that "All bills and resolutions of a legisla-tive nature shall be read three times in each House before they pass into laws."    The constitutional requirement in both these instances is specific and definite and positive ; and yet this Court held in the Broadnax case, *supra*, that the act hav-ing been certified by the Presiding Officers of both Houses as duly ratified it was not competent for the judiciary to go behind the ratification.    Chief Justice PEARSON who deliv-ered the opinion of the Court in that case, said : "We do not think it necessary to enter into the question whether this is a Public act or a Private one, in regard to which 30 days notice of the application must be given ; for taking it to be a mere private act we are of the opinion that the rati-fication certified by the Lieutenant-Governor and the Speaker of the House of Representatives makes it a mat-ter of record which can not be impeached before the Courts in a collateral way.    Lord Coke says 'A record until reversed importeth verity.'    There can be no doubt that acts of the General Assembly, like judgments of

Courts, are matters of record, and the idea that the verity of the record can be averred against in a collateral proceeding is opposed to all of the authorities. The Courts must act on the maxim '*omnia presumunter.*' Suppose an Act of Congress is returned by the President with his objections and the Vice-President and the Speaker of the House certify that it passed afterwards by the Constitutional majority, is it open for the Courts to go behind the record and hear proof to the contrary?" It is clear from the above that the meaning of the Chief Justice, when he said "We are of opinion that the ratification certified by the Lieutenant-Governor and the Speaker of the House of Representatives makes it a matter of record which cannot be impeached before the Courts in a collateral way," was, that all attacks in the Courts upon legislation which appeared to be ratified and had the signatures of the presiding officers attached, were collateral attacks, and that any direct impeachment of such acts must arise in, and be conducted by, that jurisdiction which has power in the matter—the Legislative Department. If he only meant to say that the Court *could* afford a remedy in such matters, but that they '*would* not do so in the case then before the Court, because the attack was collateral, then it would have to be admitted that he expressed himself most confusedly in one of the most important questions ever brought before the Court. That would be a bold assertion to make of Judge Pearson. And besides if the proceeding in that case was not direct but only collateral, then it is not saying too much to declare that no direct method of attacking an act of the legislature through the Courts can be devised. Certainly that was a more direct impeachment than the one now before the Court. We are not without direct authorities from other Courts than our own.

In the Case of *ex parte* Wren, 63 Miss., 512, this same

question is discussed and decided upon the same principle as was *Broadnax* v. *Groom, supra*, that Court holding that an enrolled Act of the legislature, having been signed by the presiding officers of the two Houses and the Governor, is the sole expositor of its contents and is conclusive evidence that the act so signed contains the provisions of the bill as passed by the two Houses. And the journals of those Houses cannot be resorted to, to show that such act does not contain amendments to the bill which were adopted by the two branches of the legislature. The Court said " Every other view subordinates the legislature and disregards the co-equal position in our system of the three departments of government." The opinion in Wren's case is comparatively of recent date—is a very able one—and reviews the decisions of many of the State Courts on this question. It mentions that the Courts of many of the States, including that of North Carolina in the case of *Broadnax* v. *Groom*, held the same opinion as did the Supreme Court of Mississippi.

In *Pangborn* v. *Young*, 32 N. J., 29, the principle laid down in the Broadnax case is more than endorsed. The Supreme Court of New Jersey in that case decided; first, that when an act had been passed by the legislature and signed by the Speaker of each House, approved by the Governor, and filed in the office of the Secretary of State, an exemplification of it under the Great Seal is conclusive evidence of its existence and contents ; second, that it is not competent for the Court to go behind this attestation or to admit evidence to show that the law, as actually voted on and passed and approved by the Governor, was variant from that filed in the office of the Secretary of State ; third, the minutes of the two Houses or either of them, although kept under the requirements of the Constitution, cannot be received as evidence for such purpose. In that

case the Court said: "The body which passes a law must of necessity promulgate it in some form. In point of fact the legislative power over the certification of its own laws is of necessity almost unlimited as will appear from the circumstance that, with regard to the body of an act, there is no evidence of any kind but that which the legislature itself furnishes in the copy deposited in the State archives. We are also to reflect that it is the power which passes the law which can best determine what the law is, which itself has created. The legislature in this case has certified to this Court by the hands of its two principal officers that the act now before us is the identical statute which it approved, and in my opinion it is not competent for the Court to institute an inquiry into the truth of the fact thus solemnly attested."

The above cited authorities seem to me to be founded on experience and the law, and on a wise public policy; and as Justice AVERY well said, in substance, in *Logan* v. *Railroad*, at this Term, we ought to be influenced, when looking for assistance from the decisions of other courts, by those opinions which embody sound principles and just reasoning rather than by a simple numerical array of decided cases.

I have tried to show that the decision of the Court in this case is in harmony with its former decisions and that the Court is sustained by the opinions of some of the ablest courts of other States. *State* v. *Glasgow*, 1 N. C., 176, was not even cited as an authority by the counsel for plaintiff in the argument before us. It has no bearing that I can see on this case as a law authority, though interesting as a bit of early official corruption. No legislative Act or power was questioned. It was simply the case where a former Secretary of State himself fraudu-

CARR *v.* COKE.

lently issued a land warrant, was indicted and convicted of the offence, and stripped of his official honors.

In addition, there is to my mind another insuperable objection to the adoption by the Court of the plaintiff's view of this case. It is this : There could in that event be no unity of decision even in our own Courts. If the certificate of ratification can be inquired into by the Courts, then the trial courts, with the same matter in issue, that is, whether an Act properly certified as having been ratified had duly passed its several readings, might and could arrive at different verdicts and judgments, as the proof varied in each trial. To-day a statute might be declared void because a jury had determined that it had not passed its several readings, and to-morrow the same statute in a new trial with additional testimony, or in a different court, might be declared good and valid. And, again, if ratification be not conclusive, how are the stability and integrity of our statutory laws to be maintained in other States and abroad ?

From the position I have taken in this concurring opinion, it is not necessary for me to discuss the other allegations of 'the complaint that the signatures of the presiding officers were procured by fraud. If the certificate of ratification cannot be impeached in a court of law, even by the journals themselves as evidence, it is certain that by all the rules of evidence parol proof cannot be introduced for that purpose.

In conclusion I desire to emphasize that the Court has not made a decision upon a mere matter of fraud. It is a question of jurisdiction—of power ; whether one co-equal department of the Government can invade the province of another and question or dispute the solemn act of the latter attested by the genuine signatures of those officers who are empowered and required to attest and certify those acts.

CARR v. COKE.

I insist that the decision of the Court in this case upholds the integrity and independence of one of the co-equal departments of the Government, and preserves the power and jurisdiction of the two involved in this suit. It is better for us, and will be better for posterity, if in cases where fraud and deceit have been or shall be practiced upon the presiding officers of the Senate and House, by means of which their signatures to spurious bills have been obtained, for the legislature to be convened (if an adjournment was had before discovery) and allowed to correct such errors or mistakes, than that the Court should assume a jurisdiction which does not belong to it, and thereby begin an encroachment upon the rights of the legislative department, to end possibly in judicial tyranny, the basest and the most detestable species of oppression.

AVERY, J. (dissenting): The plaintiff alleges on behalf of the people of North Carolina, that a forged paper, purporting to be an enrolled bill, that had passed both Houses of the General Assembly, was placed before the Presiding officers of the Senate and House of Representatives, and that, being misled by fraudulent misrepresentations, they were induced to attach their official signatures to it and give it the force and effect of a law. Upon these facts the plaintiff, as a citizen and in the name of the people of the State, prays the Court to declare that this paper which by such covinous trickery has been placed upon the files in the office of the Secretary of State, is not a part of the statute law and to restrain that officer from furnishing it for publication among the Acts of the Legislature. The Judge who presided in the court below holds that, admitting the paper ratified in this way to have been a forgery, the Courts are powerless to remedy this great wrong and the people can have no relief till the Legislature shall again assemble. If it be asked how this admission was made, I answer that

it was made by the Judge who heard the case below, when he held, on motion of defendant's counsel, that the plaintiff was not entitled to the relief demanded upon the face of the complaint unanswered, or, in other words, if there were no denial by answer of the allegation that the enrollment of the bill was procured by fraud and the signatures made by mistake, the Court had no authority to remedy the wrong done to the public. If authority be demanded to sustain this proposition then I refer as the last of an indefinite line of decisions sustaining this familiar doctrine to *Bank* v. *Adrian*, decided at this Term, in which the present Chief Justice, in a very elaborate opinion declared that, when a plaintiff insisted that the answer did not state facts sufficient to constitute a defence, just as the defendant contends here that the complaint fails to state facts constituting a cause of action, it was a case "in which one party alleged fraud and the other admitted it."

In my opinion, to admit that an adroit forger can fraudulently convert his own handiwork into a statute which the courts, with full knowledge of its character must enforce as law, is to confess before the world that government of the people and by the people is an egregious failure. I am not prepared to admit that Courts of Equity, which have dealt death blows to fraud wherever it has reared its hydra head, for hundreds of years, must desist from unearthing and undoing such iniquity because the perpetrator attempts to take refuge in the purlieus of the temple where a co-ordinate department of the government is in council. The arm of the law is not so shortened that it cannot right such wrong wherever done. No precincts are too sacred to be invaded by its process when such an end is in view. We cannot forget the fact that this is a case of the first impression. The judicial annals of the States of this Union have

CARR v. COKE.

been searched in vain to find a parallel for it and any argument founded upon the authorities cited is misleading in that it assumes an analogy where none exists.

As this is the first case in the history of Anglo-Saxon civilization where a forger has attempted to play the *role* of law-maker, it seems to me a fitting opportunity to vindicate the truth of the axiom that our system of jurisprudence affords an adequate remedy for every wrong done to a citizen, either as individual or as a representative of the public. Courts of Equity (says a leading law-writer) have been confidently resorted to in order to sift the consciences of men and trace out fraud, so that titles founded upon it might be declared void. When the plaintiff comes into court to demand this probing of the consciences of those who know the history of this admitted fraud and forgery, counsel for the defence meet him with the objection that the clause of the Constitution, which guarantees the independence of three co-ordinate branches of the State government, is an insuperable barrier to any action on the part of the Courts. Section 8, of Article I, of the Constitution, provides that "The legislative, executive and supreme judicial powers of the State ought to be forever·separate and distinct." Is it an invasion of the domain of either of the other two departments to draw in question before the courts the validity of an instrument only attested by the chief officers of either of them? The organic law, it will be observed, couples the Executive with the Legislative Department. Where a private citizen of North Carolina records an entry upon the entry-taker's books, containing a specific description of a tract of land, or by a survey makes an indefinite description certain, before his neighbor makes an entry of the same land, though the latter may procure an older grant signed by the Governor of the State, the Courts in the exercise of their equitable jurisdiction

have never hesitated, upon application of the senior enterer, to declare the older grant issued by the head of the Executive Department null and void, and to compel the junior enterer tò convey the legal title to him who has the better right, because with notice that his neighbor had expended his money for an entry of the same land the junior enterer is guilty of *fraud* in procuring the first title from the State. *Johnston* v. *Shelton*, 4 Ired. Eq., 85; *Harris* v. *Ewing*, 1 Dev. & Bat., 374; *Currie* v. *Gibson*, 4 Jones Eq., 25; *Munroe* v. *McCormick*, 6 Ired. Eq., 85; *Grayson* v. *English*, 115 N. C., 358. Though grants for land are signed by the chief officer of a co-ordinate branch of the government, it has never been suggested during the century in which the courts have been setting aside these solemn patents, under the great seal of State, on the ground that they were procured by fraud, that the courts were invading the independent domain of the Governor, as the head of the Executive Department.

This being a case of the first impression here, the issue must not be obscured by remote analogies, drawn from precedents not in point. If Section 8, of Article 1, of the Constitution, is invoked to prevent the investigation demanded by the people through that one of their number, whom they have chosen as their Executive Chief, it will be seen at a glance by layman as well as lawyer that the Constitution affords the same protection to the independence of the Executive as of the legislative and judicial departments. If it is an impenetrable shield, behind which fraud may stalk secure and mock with ghoulish glee the anger of an injured people, when suit is brought to show that the signatures of the two presiding officers of the two branches of the Legislature were procured by fraud and attached by mistake to an instrument affecting the rights of the whole body of the people,

how is it that it has never occurred to the long line of illustrious men, who have preceded us in this Court, that it was an invasion of the distinct power of the Executive Department to set aside its Great Seal, which above all things imports verity at home and abroad, and the signature of its chief officer, where a single citizen complains that another procured that solemn attestation in fraud of the complainant's individual right?

The single issue of law presented by this appeal is whether a forged paper purporting to be an enrolled bill that had passed both houses, when presented to the presiding officers and signed by them under the mistaken belief that it is genuine, is open to attack for fraud like a grant signed by the Governor. The gravamen of the complaint is embodied in Section 11, where it is alleged that "By some means unknown to this plaintiff, but which he is informed and believes to be fraudulent, the said bill was enrolled by some person to the plaintiff unknown, in the office of the enrolling clerk and signed by mistake by the President of the Senate and Speaker of the House of Representatives upon the day upon which it purports to have been ratified."

Equity vacates a patent which the Governor signs, not by mistake but in accordance with the requirements of law, because it is procured in fraud of the superior rights of a single citizen. Why then, shall the same tribunal declare itself powerless to rectify a fraud upon the rights of the whole people of the State, accomplished by imposition practiced in the most specious way, directly upon the chiefs of the two branches of the legislative department?

When the people met in convention and framed a Constitution they expressly delegated certain powers to each of the three Departments, and prohibited one or all of these agencies, for the most part, in article 1, in terms quite as clear, from exercising certain other sovereign authority.

The result was, that while the legislature, as the representatives of the popular will, is still clothed with the residuary power, or that which is not expressly granted to either of the other departments and that does not fall within the prohibitions mentioned, it is in the exercise of its own delegated authority, co-equal, not superior, to the other co-ordinate branches acting within the purview of their powers. All three are mere agents of the people, acting under an express power of attorney.   When therefore it is provided in Section 16, Art. III, of the Constitution, that "All grants and commissions shall be issued in the name and by authority of the State of North Carolina, sealed with the Great Seal of the State, *signed by the Governor* and countersigned by the Secretary of State", and in Section 23, Art. II, that "All bills, &c., shall be signed by the presiding officers of the two houses", the one clause is hedged about with no more of the divinity of sovereignty than the other.

*Battle, Judge,* says in *State* v. *Glen,* 7 Jones, 321, "Our predecessors were the first of any Judges in any State in the Union, to assume and exercise the jurisdiction of deciding that a legislative enactment was forbidden by the Constitution and was therefore null and void.   See *Bayard* v. *Singleton,* Martin's (N. C.) Rep., 48, decided in November, 1789, which was four or five years anterior to the earliest case on the subject referred to by Chancellor Kent. 1 Kent's Com., 450."  Since that early day this Court has never hesitated to assume this authority to pronounce a statute passed by the legislature with all of the forms of law, null and void because repugnant to the Constitution.   Indeed at this Term an act which had not been published in the laws, but which was regularly passed at the last session of the legislature, has been in effect declared unconstitutional, because the right of exacting more than six per cent. as

CARR *v.* COKE.

interest allowed therein was held to fall within the constitutional inhibition against granting special privileges.

No one questions the right of this Court in a proper case to pronounce an Act, which is admitted to embody the true sentiment of the Legislature, void on the ground that it had no right to pass it, yet, if what now purports to be the statute before us had provided that the lawful rate of interest in this State should be three per cent. a month, or thirty-six per annum, and its passage had been procured by speculators and note-shavers, it would nevertheless be contended, if the opinion of the Court is founded upon the correct interpretation of the organic law, that the people would be placed in the dreadful dilemma of groaning under such a burden, until another General Assembly should meet, or of asking the Governor to call an extraordinary session, at a heavy expense, of the same Legislature, that according to the admissions in the pleadings failed at its last session to close some of its Clerk's rooms against forgery and fraud. I do not believe that the law properly interpreted reduces us to this dire extremity.

There would be a prospect of a much more economical and satisfactory settlement of this controversy by the trial before a jury of an issue of fraud, as demanded by the plaintiff, than by inviting the same bodies with the same lobbyists lurking around them, to remedy the great wrong that the public have suffered through some agency that was, at its last session, able to reach its employees. With due deference for the views of others, I am of opinion that we ought on this question, which has been presented to us first of all the courts of America, to follow the example of our predecessors more than a century ago, and assert for the courts the power to unravel fraud, even if the tangled skein should take us behind the solemn act of ratification by presiding officers, as did the determination of the early

judges to prevent violations of the sacred instrument which they had sworn to support.

The clear-cut issue of law raised by admitting the truth of the charge of fraud must not be obscured by discussing the preceding allegations in reference to a bill, in the same words, the legislative history of which is traced till it is found' tabled in the House and turned over to the State Librarian, who is the custodian of bills, which are thus strangled in the earlier stages of their existence. These allegations are, at most, but an attempt to negative the idea in advance, that the forged paper had a legislative history leading up to its ratification, which the defendant might contend could not be contradicted. It does not seem to me bad pleading to have inserted these allegations, when the relief demanded was a perpetual restraining order against the defendant, although the plaintiff relied solely upon the ground that the paper presented to the presiding officers was falsely and fraudulently represented to them to be an enrolled bill and its ratification procured in that way. Counsel for the defendant cannot be allowed "to blow hot and cold" to induce the Court, on motion, to hold that it cannot hear proof of the allegation of fraud, if true, and then to say by way of breaking the force of the ruling invoked that they could disprove the charges of forgery and fraud, if they would. The fact that the bill was enrolled without authority and signed by mistake, is not, for the purposes of this appeal, denied by any one. That it is fraudulently enrolled and presented for signature is alleged in the complaint, and His Honor holds that even though all this is true the Court has no jurisdiction to hear evidence to show its truth.

The argument deduced from supposed future inconvenience is always the most specious and unsatisfactory kind of reasoning. To the suggestion that possible evils may

CARR *v.* COKE.

ensue from sustaining the power of the Courts to impeach the validity of a statute, it may be answered that the announcement that the Constitution is a shield for manufacturers of forged law will indeed open a Pandora's box, out of which will issue invitations to those who are capable of such a crime to throng the lobbies of our legislative halls and make, by bribery, forgery and other fraudulent practices, the laws which should be framed to afford remedies for the grievances and protection to the rights of the people.

A free government like ours must always be dependent for its stability more upon the virtue and integrity than upon the intelligence of its citizens. As well might we insist that the statute, which allows any person in the State to make affidavit that any other person has, as he is informed and believes, committed murder, and demand a warrant for his arrest, should be repealed because it opens a way for the arrest of every innocent man in the State, as that to permit investigation of the allegation that what purports to be a law regularly ratified is not in reality an expression of the will of the people through their representatives, but the work of a forger, would raise a doubt as to the validity of every statute passed by the legislature. Where a plaintiff asks, on behalf of the people, an order restraining the Secretary of State from publishing a ratified Act on file in his office he is required to make an oath, which if made falsely and without probable cause subjects him to punishment for perjury. It is not to be supposed that such risks will be taken inconsiderately, and, if the perpetrators of this disgraceful crime could be impaled before the world and held up to public execration, it is to be hoped that another century of our history would glide by without such a flagrant instance of corrupt interference with legislation.

I understand my brethren to concede, what cannot be

116—17

denied, that not one of these cases cited to sustain the opinion of the Court is exactly in point here, for the reason that it has never before been charged, much less proved, that the ratification of a forged bill was fraudulently procured, when it had not in fact passed. The question raised in the cases relied upon by the majority of the Court to sustain their position, was whether the journals of the two legislative houses could be used to show that an enrolled bill did not pass. No such thing is proposed by the plaintiff here. In the complaint he says that a paper purporting to be an act of the legislature was fraudulently enrolled and signed by mistake, and, as introductory to this allegation, he avers in substance that the journals not only do not contradict but tend to confirm it. A similar bill passed its first reading in the House of Representatives, was tabled on its second reading, and can now be adduced in evidence from the office of the lawful custodian of such papers. The journal of the Senate fails to show that any such bill was ever before that body. So that the record of the one body, as far as it goes, tends to corroborate, while there is no recorded history of any such bill in the journals of the other to contradict what is relied upon by the plaintiff as the basis of his action, the fact that a forged paper, signed by the presiding officers by mistake, is now being enforced to restrict the right of the citizen, in the interest of the procurers of this monumental fraud. Looking at the case from the standpoint of my brethren, it appears from a brief of cases involving the question whether the ratification can be contradicted by the journals, which will be found in the notes on pages 661–667 of Volume 143 of the United States Reports, that, in 28 of the States, the courts have held that it is competent to impeach the ratification by the journals directly; while it is held to the contrary in but nine States. The conceded fact that in some

of those States there are constitutional amendments pro-
viding that the ratification may be contradicted by the
journals shows conclusively that we have no reason to
fear the threatened ills which are prophesied as probable
results of going behind the ratification of an act to show
that it did not pass and that its enrollment was procured
by fraud, when twenty-eight States still afford good gov-
ernment to their citizens, after permitting the journals to
be used to show, not fraud, but that the ratified bill did not
pass.    Indeed it is worthy of special notice that the for-
gery of what purports to be an enrolled bill has been first
attempted where the people had never been permitted to
go behind the ratification and when it was hoped by the
perpetrators of the fraud that their covinous work would
prove, as it has done, effectual.    When the courts of more
than three-fourths of the States have ventured to go behind
the ratification of statutes to call in question the regularity
of the successive steps preceding the signing by the pre-
siding officers, it seems to me that we may venture, when
the first attempt is made to impeach for fraud instead of
irregularity, to look for an analogy to govern us rather to
the views of the twenty-eight than to the opinions of the
nine Courts.

The position of the Court, in my opinion, finds no sup-
port in the case of *Broadnax* v. *Groom*, 64 N. C., 244,
where Chief Justice PEARSON, speaking for the Court, holds
that "The ratification certified by the Lieutenant-Governor
and the Speaker of the House of Representatives makes it
a matter of record, which cannot be impeached before the
courts *in a collateral way*."    But the plaintiff is making
not a collateral, but a direct attack, and the Court in that
opinion concedes that even a record can be successfully
avoided and reversed, where it is directly attacked for
fraud or irregularity.    It is true that where there is a

CARR *v.* COKE.

want of jurisdiction apparent upon the face of a record, it may be impeached without any direct proceeding, just as the validity of ratified statute may be questioned for repugnance to the Constitution. *Springer* v. *Shavender*, decided at this Term. If the Constitution does not forbid, why should public policy prohibit a citizen on behalf of the whole people from impeaching a statute for fraud, when for his own protection he may attack a judgment regular upon its face? It was said *obiter* in *Scarborough* v. *Robinson*, 81 N. C., 409, that the journals could not be introduced to attack the existence and validity of a statute regularly filed among the records in the office of the Secretary of State. If that doctrine is conceded to have the force of law, it in no wise affects a case where the plaintiff relies upon proving that the enrollment of the bill was procured by fraud, and where, if the defendant resorts to the journals to disprove it, he finds that they tend rather to corroborate than to contradict the allegation. The opinion of the majority of the Court, in the case of *Cook* v. *Meares*, decided at this Term, intimates very broadly that the opinion in *Scarborough* v. *Robinson* ought to be overruled upon the point really involved, because it conceded to the presiding officers, if corrupt or unmindful of their duty, the power by refusing to sign to in reality veto bills regularly passed by the Representatives of the people. Should we, then, standing in a position to make a precedent for the courts of America, hesitate to declare invalid an act which, we must assume, both of these officials would declare to have been done by mistake on their part, and to have been procured by fraud on the part of others?

I deeply regret that the majority of the Court have deemed it their duty to hold that the Courts have no power to investigate and remedy the great wrong which has been

CARR v. COKE.

done to the public. I regret it because it gives immunity to the wrong-doers in this case, and, in my judgment, encouragement to others to attempt like frauds in the future.

CLARK, J. (dissenting): A demurrer *ore tenus* was entered and the action dismissed because a cause of action was not stated. For the purposes of this proceeding, therefore, the allegations of the complaint are admitted to be true. It is thereby admitted that a bill was introduced into the lower House of the General Assembly; that this bill on its second reading was voted down by the Representatives of the people; that the Journal also shows that fact, and the bill itself was stamped "tabled" and placed in the package of "tabled" bills, where it still remains. It is further admitted that the bill was not introduced in the Senate at all but, that notwithstanding the bill was defeated in one House and never presented for consideration in the other, a fraudulent copy of a bill of similar tenor was procured to be made by a sub-copyist of .the enrolling clerk, and by mistake on the part of the two speakers, who were made to believe that it was a bill which had been duly read three times in each House, it was signed by them. The purport of the bill is to prohibit debtors from preferring any creditor in making assignments.

The plaintiff alleges that as a tax-payer he has a right to be protected from paying the expenses of printing the fraudulent bill and distributing it among the laws of the State; that as a citizen he has a right to be excused from including it among the laws which as a voter he has sworn to support, and that as a creditor the right he has had by our laws, time out of time, to have his debtors prefer him, should they see fit, should not be taken away from him against the will of the people, as expressed by their repre-

sentatives in this legislature, as likewise in many previous ones.

The Constitution under which we live, and which every officer of the State, from the highest to the least, and every registered voter has sworn to support, provides that "All bills shall be read three times in each House *before they pass into laws.*" It is admitted here that this pretended law has not been read three times in each House. It is admitted that it·has not been read three times in either House. It is admitted that it was read in only one House, and in that the people, through their representatives, defeated it and refused to let it pass. It is admitted that subsequently the Speakers were imposed upon and erroneously certified that the bill had passed three readings in each House.

It is contended, however, that we cannot go behind the signatures of the Speakers. But the signatures of the Speakers, procured by fraud, are not their signatures. Fraud vitiates them as it vitiates everything it touches. It is urged, however, that it is dangerous to open up the Acts of the Legislature to be set aside for fraud, and that this would unsettle the laws. The fraud alleged is not in procuring the passage of an Act, but in procuring an untrue certificate that it has been passed. If the alleged statute is not the will of the people, expressed in a constitutional way by three readings in each house of the General Assembly, there is no power to make it a law, and no consideration of danger should prevent a declaration that the laws heretofore made by the people, in the constitutional mode, cannot be repealed, revoked and set aside in this mode. If there could be any danger in refusing to admit as a law a bill, which, without having been passed, is untruly certified as having been passed, it is to be remembered that among a free people, no other danger is comparable to that of

substituting in the enactment of laws for the will of the people the power of money in securing, by shifty devices, a false certificate of the passage of an Act, and a holding by the Courts that such villiany is conclusive and above the power of the people to correct through their courts. Deeds signed, sealed and delivered bind the parties, but it has never been considered that land titles would be unsettled if deeds procured by fraud were set aside. This rather tends to avoid land troubles. So, rejecting from the statute book a surreptitious bill which admittedly was not enacted by the votes of the people's representatives is not to unsettle the laws, but to establish them "broad-based upon the people's will." If a judgment of this or any other Court under seal should be procured by mistake or fraud, it can be set aside.

It is urged, however, that this touches a co-ordinate department of the government. But the Judiciary is the only body authorized to investigate and ascertain whether it is the act of the General Assembly, or a measure which, rejected by the body, has nevertheless been fraudulently palmed off on the Speakers and their signatures thereto procured by fraud practiced on them. The Executive is also a co-ordinate department. It is matter of history that towards the close of the last century certain land warrants were fraudulently issued by the Secretary of State, the broad seal of the State was affixed, and the Governor being misled honestly affixed his signature (as the Speakers did here), but the Court went behind the Great Seal, behind the admittedly genuine signature of the Governor, set the fraudulent land warrants aside, and jailed the agent of the fraud, and the next Legislature changed the name of the county (Glasgow) which had been named in honor of the dishonest Secretary of State.

The Supreme Court of this State had its origin in the

organization by law of a temporary tribunal created to investigate and set aside this fraud perpetrated on the Executive Department, and indeed by one of its heads and to punish its perpetrators. *State* v. *Glasgow*, Conference Rep., 38 (1 N. C.) It would be singular if after the lapse of nearly a century the developed Court, with larger powers and chosen by the people, should be powerless to set aside and annul a greater fraud upon popular rights perpetrated by simulating the people's *imprimatur* in passing off, as a law of the State, a bill which their Representatives rejected, and which some corrupt hireling of interested parties procured to be falsely certified as an Act of the General Assembly by the officers of that body, who were deceived, in the rush and hurry of the closing hours of the session, into believing it was a genuine bill. Failing for many sessions to procure the passage of the act from the popular assembly, the interested parties fraudulently procured this bill to be certified as having been passed. To give it currency as law is to pass off "the buzzard in the eagle's nest" as the imperial eagle itself. We acknowledge as laws only the legal expression of the people's will. This bill is not the people's will. It is what their Representatives have declared by a vote was not their will. It is not such as this that the men of North Carolina have sworn to support as "laws." It is such as this which we have sworn not to support as laws, by our oath to a Constitution which says nothing shall be a law till it has been adopted by having received the assent of our Representatives on three several occasions in each House of the General Assembly. This has not only not received such assent, but has received their refusal.

The power to construe a law necessarily carries with it the power to investigate whether a pretended law is really

CARR *v.* COKE.

a law duly enacted or a fraudulent simulation which in fact was never enacted into law.

In the presence of so vital and so plain a principle, precedents are not needed, but we have them. The Constitution provides that, before becoming laws, bills shall be read three times in each House *and* shall be signed by the Speakers. In *Scarborough* v. *Robinson*, 81 N. C., 409, it was held that if the latter requirement was lacking, the bill was not a law, even though it had the other and far more important requirement of having been passed three times in each House. A *fortiori*, if the bill has not received the assent of the three constitutional readings, it cannot be the will of the General Assembly. To hold otherwise would be to sacrifice form to substance, and to say that the certificate of the Speaker is sufficient without a vote of the General Assembly, and ( as in this case ) in spite of an adverse vote of that body. Again, the Constitution requires that the style of an Act shall be, " The General Assembly of North Carolina do enact." In *State* v. *Patterson*, 98 N. C., 660, it was held that although the Speakers had signed and certified a bill as ratified, yet, if this formula was omitted therefrom, it was a nullity, because the Constitution required it.

But we are in the presence of a greater and more important constitutional requirement than the formula which begins an act, or the certificate of the speakers. These are matters of form and essential only because required by the Constitution. We are now face to face with the constitutional requirement that the bill shall three times receive the assent of each House "before it shall become a law," and the principle, greater than the Constitution itself, that the law-making power resides in the sovereign people to be exercised by their representatives, and that nothing shall be law unless voted by them, and espe-

cially nothing shall be law which (as in this case) has been refused by their vote. Even the common law itself is law in this State only by virtue of an enactment of the General Assembly.

In other States, questions have come up as to the power to go behind the certificate of ratification signed by the Speakers, in cases of mere irregularities, and it has been held in twenty-eight States that this can be done, as this Court has already held in *State* v. *Patterson, supra.* In nine States only, it has been held that the certificate of ratification is conclusive against irregularities. These cases need not be here recited and reviewed. They are easily accessible in the 23 Am. & Eng. Enc., 196 *et seq.* But in none of these cases have we the bold and glaring and admitted fraud upon popular sovereignty, which is here presented.

. The requirement that thirty days notice must be given of a private law is a condition precedent which the legislature passes upon, but a constitutional provision that the bill must be *read three times* in each House *before it passes into law* goes into the essential matter which a court must determine in passing upon the question whether a printed piece of paper laid before it is a legislative enactment. The certificate of the speaker is certainly *prima facie* and very strong presumption that it is, but when the very matter at issue is the allegation that the certificate of the Speaker was procured by fraud (and this is admitted by the demurrer), then it is begging the question to say that such piece of paper is conclusively the law of the land without the vote, nay, against the votes, of the law-making power. It is also begging the question to say that the legislature certifies to us, over the signatures of their two principal officers, that this act was passed. The very issue is, did the two officers so certify, or were their signatures procured

by fraud. If so, it is in law not their signatures and this is admitted by the demurrer which admits the allegations that in truth the bill did not pass, but was defeated, and that the certificate of the presiding officers is false and was procured by fraud practiced on them, an allegation which those officers in justice to themselves should have been permitted to prove by their own testimony in court.

The people are the source of all power, but if there is fraud in certifying untruly to the declaration of their will at the ballot box the courts can and will right the wrong and declare the true result. Whence comes it that the legislative department is so superior, or so inferior, that a certificate, fraudulently procured, which falsely certifies that it has passed a bill, can not be set aside on proof that, in truth, the opposite result was declared. The Courts have the same power to investigate in one case as in the other.

It is not the declaration of the result of a vote by the legislature itself which is in question, for that would be conclusive, but the false certificate that it had so declared, when it is admitted that the legislature declared just the opposite by tabling the bill.

In this proceeding, if the jury found that the certificate was false and was fraudulently procured, the judgment would be to strike the fraudulent bill out of the files and out of the printed laws and to declare it, what it is, a nullity, as to all the world. This being an equitable jurisdiction the action can only be maintained in the Superior Court and one action is conclusive. It is not open to the objection that such proceedings might, if allowed, be brought before a justice of the peace, nor that there might be different verdicts before different juries. That might be urged against a proceeding as in *Wyatt* v. *M'f'g Co.*, at this Term, where the invalidity of an act is attempted to

be set up, collaterally as it were, in litigation between parties. But it cannot apply where the proceeding is brought against the Secretary of State directly to have the act, which is fraudulently procured to be certified, struck out of the files of enrolled bills in his office and declared a nullity. In *Cook* v. *Meares*, at this Term, FURCHES, J., speaking for the Court, animadverted upon the holding in *Scarborough* v. *Robinson* that the signatures of the speakers were essential to the validity of an act on the ground that this is to give them an unrevisable veto power. For a stronger reason, then, to give to their signatures the effect of law, without, or contrary to, the vote of the legislature is to give them far more than an unrevisable negative power of veto. It gives them the unrevisable positive legislative power. In this case, there is even more, for this vast power, without revision by any authority, is vested in their signatures when procured by fraud if the courts cannot reject a pretended act, even when it is offered to be proved by the verdict of a jury that such act did not pass the legislature and was not intentionally signed by the speakers and the speakers are not allowed to testify that their signatures were procured by fraud.

The Constitution does not require that the presiding officers shall sign bills in the presence of the Houses or with their assent, and neither the certificate itself nor the complaint indicates that this was done. It may be the usual practice, but it is not required, nor does it appear to have been done; hence, there is no presumption that it was done, upon which an argument can be based. The signing has no law making power in itself, but is a mere certification of what the law-making body has decided, and like all certificates may be impeached for fraud or mistake; otherwise, the certificate is more powerful than the authority doing the act which is certified.

If we could conceive that the two presiding officers of any legislature should purposely certify that a bill has passed, which had in fact been defeated, this could not nullify the action of the two Houses. If it could, then, they and not the General Assembly, are the law-making power. Certainly, for a stronger reason, when the signatures of the presiding officers are procured by a trick and fraud practiced on them, there can not be such virtue therein as to make a law against the vote of the body.

The case most strongly relied on by the defendant is _Field_ v. _Clark_, 143 U. S., 295, but in that case it was admitted that the Act had passed both Houses and had been approved by the President, and the point decided by the Court was that the Act would not be vitiated because a Section, which was in it when passed by the Houses, was omitted in the enrolled Act on file. It must be noted also that the United States Constitution does not contain the essential provision which is in our Constitution that "Each bill must be read three times in each House before it becomes a law," and that in addition to the signatures of the Speakers there is the further safe-guard that the bill is subject to the supervision and approval of the President, which the bill there in question had. Notwithstanding these vital differences in the two Constitutions and the remote bearing the actual point there decided has upon this case, the court nevertheless takes occasion to say (Harlan, J.) in that very opinion: "A bill signed by the Speaker of the House of Representatives and by the President of the Senate, presented to and approved by the President of the United States, and delivered by the latter to the Secretary of State as an Act passed by Congress, does not become a law of the United States _if it had not in fact been passed by Congress._ In view of the express requirements of the Constitution the correctness of this general principle can-

CARR *v.* COKE.

not be doubted." An enunciation more exactly in point in its application to the controversy before us cannot be found.

Here, the bill was not voted in either House, but was expressly negatived by a vote, and this fact appears by the Journals (which are required by the Constitution to be kept) and is also admittedly beyond controversy. The certificate of ratification was not purposely and knowingly appended by the Speakers. They never knowingly intended to certify that this bill had been read three times in each House. Their signatures were inadvertently appended and were procured by a gross fraud. They, in law, are not their signatures. This is not the "signing" which the Constitution requires to bills which have, three times *before* such signing, been read with the approval of each House.

The conflicting decisions from other States as to whether the signatures of the Speakers can be contradicted by the journals have no application to this case where the allegation is of fraud in procuring their signatures.

The facts of this great fraud are admitted for the purpose of this appeal, for, though the complaint makes these allegations, the action is dismissed "because a cause of action is not stated." It must be lawful to allege and to prove such fraud if "government by the people and for the people" is to continue. Otherwise, government by fraud has begun, the sure and unfailing sign in all history that the end of representative government is at hand. The judgment below should be reversed.